1 | Kevin J. Yourman
2 | Vahn Alexander
Jennifer R. Williams
WEISS & YOURMAN
3 | 10940 Wilshire Boulevard
24th Floor
4 | Los Angeles, CA 90024
Tel:  (310) 208-2800
5 | Fax: (310) 209-2348

6 | Joseph H. Weiss
WEISS & YOURMAN
7 | 551 Fifth Ave., Suite 1600
New York, NY 10176
8 | Tel:  (212) 682-3025
Fax: (212) 682-3010

9 |
*Lead Counsel for Plaintiffs*

10 |

11 |

**UNITED STATES DISTRICT COURT**

12 |

**NORTHERN DISTRICT OF CALIFORNIA**

13 |

14 | BRUCE MOLHOLT, on Behalf of Himself and all Others Similarly Situated,

                           Plaintiff,

          vs.

LOUDCLOUD, INC., GOLDMAN SACHS & CO., MORGAN STANLEY & CO. INC., THOMAS WEISEL PARTNERS LLC, EPOCH SECURITIES, INC., ALLEN & COMPANY INC., CIBC WORLD MARKETS CORP., DAIN RAUSCHER  INCORPORATED, RAYMOND JAMES & ASSOCIATES, INC., ROBERTSON STEPHENS, INC., WIT SOUNDVIEW CORP., MARC L. ANDREESSEN, BENJAMIN A. HOROWITZ, RODERICK M. SHERWOOD III, WILLIAM V. CAMPBELL, MICHAEL S. OVITZ and ANDREW S. RACHLEFF,

                         Defendants. | CASE NO.: C-01-20919 PVT

<u>**CLASS ACTION**</u>

**CONSOLIDATED COMPLAINT FOR THE VIOLATION OF FEDERAL SECURITIES LAWS**

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs, as and for their consolidated complaint, allege the following, based, *inter alia*, on the investigation conducted by plaintiffs' attorneys, including a review of the press releases and public filings of defendant Loudcloud, Inc. ("Loudcloud" or the "Company"), articles pertaining to the Company and interviews with former employees of the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a securities class action brought on behalf of all persons, other than defendants, who purchased or otherwise acquired the securities of Loudcloud through an initial public offering (the "Offering" or "IPO") made pursuant to a registration statement ("Registration Statement") and prospectus ("Prospectus"), declared effective by the SEC on or about March 8, 2001, and on the open market during the time period of March 8, 2001 and May 1, 2001 (the "Class Period").  This action is brought to recover damages caused by defendants' artificial inflation of the price of Loudcloud securities through a series of materially false and misleading statements in violation of §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rules 10b-5.

2.      Defendants committed the fraud described herein so that they: (a) could obtain financing to fund the Company, which was in jeopardy of not being able to continue as a going concern; (b) would be able to maintain their positions with the Company; and (c) could profit by creating a liquid market for their shares which did not exist prior to the Offering.  Thus, in this manner, defendants would not only be able to enhance the value, *i.e.*, the liquidity of their own Loudcloud holdings, they would also be able to maintain the very existence of the Company, which was their primary concern.

3.      Moreover, the Prospectus was false and misleading because, among other things, it failed to disclose: (a) Loudcloud's plans to substantially reduce its work force and to restructure itself prior to, during and after its IPO; and (b) the fact that the funds to be raised by the IPO would be insufficient to enable the Company to reach profitability and accomplish the

1 planned expansion described in the Prospectus.

2 **JURISDICTION**

3   4.   The claims asserted herein arise under, and pursuant to, §§11, 12(a)(2) and 15 of

4 the Securities Act [15 U.S.C. §77k, 77l(a)(2) and 77o]; §§10(b) and 20(a) of the Exchange Act

5 [15 U.S.C. §§78j(b) and 78t(a)] and Rules 10b-5 [17 C.F.R. §240.10b-5] promulgated

6 thereunder by the SEC.

7   5.   This Court has jurisdiction over the subject matter of this action pursuant to §22

8 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §§1331 and 1337 and §27 of the

9 Exchange Act [15 U.S.C. §78aa].

10   6.   Venue is proper in this District pursuant to §27 of the Exchange Act, and 28

11 U.S.C. §§1391(b).  Defendant Loudcloud maintains its principal place of business in this

12 District and many of the acts and practices complained of herein occurred in substantial part in

13 this District.

14   7.   In connection with the acts alleged in this complaint, defendants, directly or

15 indirectly, used the means and instrumentalities of interstate commerce, including, but not

16 limited to, the mails, interstate telephone communications and the facilities of the national

17 securities markets.

18 **PARTIES**

19   8.   Plaintiff Stanley Roth is the Court appointed Lead Plaintiff in this consolidated

20 action.

21   9.   The plaintiff Class (as defined herein), including Mr. Roth, purchased their

22 securities of Loudcloud in the IPO, or traceable to it, and/or acquired Loudcloud securities in

23 exchange for shares, ADR's, or options in other companies which were acquired by the

24 Company during the Class Period and have been damaged thereby.

25   10.   Defendant Loudcloud is a Delaware corporation which was originally

26 incorporated in September 1999 under the name Vcellar, Inc.  The name was changed to

27 Loudcloud, Inc. in November of 1999.  At all relevant times, the Company's principal

28 executive offices were located at 599 N. Mathilda Avenue, Sunnyvale, California, 94085.

1    Loudcloud was formed by Mr. Marc L. Andreessen, Mr. Benjamin A. Horowitz, Mr. Tim

2    Howes and Mr. In Sik Rhee, all former members of the Netscape team, to enter into the

3    outsourcing business.  In other words, Loudcloud was a contractor building and managing Web

4    sites for large companies.

5           11.    At all relevant times, defendant Marc L. Andreessen ("Andreessen") was the co-

6    founder of Loudcloud and since September 1999 served as the Chairman of the Board of

7    Directors.  Prior to co-founding Loudcloud, Mr. Andreessen served as Chief Technology

8    Officer of America Online, Inc., from February 1999 to September 1999.  Mr. Andreessen was

9    also a co-founder of Netscape Communications Corporation, an open software provider,

10   serving in various positions from April 1994 until March 1999, including Chief Technology

11   Officer and Executive Vice President of Products.  He served on Netscape's Board of Directors

12   from April 1994 until March 1999.  In November 1999, Andreessen entered into a stock

13   restriction agreement with Loudcloud regarding his purchase of shares of Series A preferred

14   stock convertible into 6,125,000 shares of common stock at a purchase price of $0.32654 per

15   share pursuant to a stock purchase agreement.  Mr. Andreessen was also the beneficial owner of

16   8,610,899 shares of Loudcloud securities.  Before the Offering, Mr. Andreessen owned 18.2%

17   of Company common stock and after the Offering he owned 11.8%.

18          12.    At all relevant times, defendant Benjamin A. Horowitz ("Horowitz") was a co-

19   founder of Loudcloud and since September 1999 served as President and Chief Executive

20   Officer and as a director.  Prior to co-founding Loudcloud, from April 1999 to September 1999,

21   Mr. Horowitz served as Vice President and General Manager of the E-Commerce Platform

22   division of America Online, Inc.  From July 1995 to April 1999, Mr. Horowitz was a vice

23   president at Netscape Communications.  In October 1999, Horowitz purchased 4,060,000

24   shares of Company common stock at a purchase price of $0.002 per share.  Mr. Horowitz was

25   also the beneficial owner of 4,158,453 shares of Loudcloud securities.  Before the Offering, Mr.

26   Horowitz owned 8.8% of Company common stock and after the Offering he owned 5.7%.

27          13.    At all relevant times since August 2000, defendant Roderick M. Sherwood III

28   ("Sherwood") served as Executive Vice President and Chief Financial Officer of Loudcloud.

1  Prior to joining Loudcloud, from July 1999 to August 2000, Mr. Sherwood was Senior Vice

2  President and Chief Financial Officer of BroadStream Corporation, a broadband wireless

3  communications company.  From February 1998 to June 1999, Mr. Sherwood was President of

4  the Spaceway broadband services business at Hughes Electronics Corporation, a

5  communications company, and Senior Vice President and General Manager of Spaceway at

6  Hughes Network Systems, a subsidiary of Hughes Electronics.  From May 1997 to January

7  1998, Mr. Sherwood was Executive Vice President of DIRECTV International at Hughes

8  Electronics.  From July 1996 to April 1997, Mr. Sherwood was Senior Vice President and Chief

9  Financial Officer of Hughes Telecommunications and Space Company and DIRECTV

10  International.  From May 1995 to June 1996, Mr. Sherwood was Corporate Vice President and

11  Treasurer at Hughes Electronics.  Prior to that, Mr. Sherwood occupied various financial

12  positions at Chrysler Corporation over a 14-year period, including Assistant Treasurer.  Mr.

13  Sherwood was also the beneficial owner of 893,698 shares of Loudcloud securities.  Before the

14  Offering, Mr. Sherwood owned 1.9% of Company common stock and after the Offering he

15  owned 1.2%.

16       14.    At all relevant times since August 2000, defendant William V. Campbell

17  ("Campbell") served as a director of Loudcloud.  Since August 1998, Mr. Campbell served as

18  Chairman of the Board of Intuit Inc., an electronic finance company, and from September 1999

19  until January 2000 served as its Acting Chief Executive Officer.  Mr. Campbell also served as

20  Intuit's President and Chief Executive Officer from April 1994 through July 1998.  Mr.

21  Campbell also served on the Board of Directors of SanDisk Corporation and Apple Computer,

22  Inc.

23       15.    At all relevant times since July 2000, defendant Michael S. Ovitz ("Ovitz")

24  served as a director of Loudcloud.  Mr. Ovitz co-founded Creative Artists Agency, a talent

25  representation company, and served as its Chairman from 1975 to 1995.  In January 1999, Mr.

26  Ovitz founded CKE Companies, which is comprised of four distinct companies: Artists

27  Management Group, a talent representation company, Artists Production Group, a film

28  production company, Artists Television Group, a television production company and Lynx

1    Technology Group, a technology investment and consulting company.  From January 1997 to

2    December 1998, Mr. Ovitz was a self-employed private investor.  From October 1995 to

3    December 1996, Mr. Ovitz was President at The Walt Disney Company, an entertainment

4    company.  Mr. Ovitz was also the beneficial owner of 186,112 shares of Loudcloud securities.

5        16.    At all relevant times since November 1999, defendant Andrew S. Rachleff

6    ("Rachleff") served as a director of Loudcloud.  In May 1995, Mr. Rachleff co-founded

7    Benchmark Capital, a venture capital firm.  Prior to co-founding Benchmark Capital, Mr.

8    Rachleff spent ten years as a general partner with Merrill, Pickard, Anderson & Eyre, a venture

9    capital firm.  Mr. Rachleff also served on the Boards of Directors of CacheFlow, Inc., Equinix,

10   Inc., NorthPoint Communications Group, Inc. and several privately held companies.  Mr.

11   Rachleff was also the beneficial owner of 9,215,712 shares of Loudcloud securities.  Before the

12   Offering, Mr. Rachleff owned 19.5% of Company common stock and after the Offering he

13   owned 12.6%.

14       17.    Defendants Andreessen, Horowitz, Sherwood, Campbell, Ovitz and Rachleff,

15   are referred to collectively as the "Individual Defendants" and together with the Company

16   constitute the "Loudcloud Defendants."

17       18.    Because of their positions with the Company, the Individual Defendants had

18   access to the Company's files and records, its customers and the adverse undisclosed

19   information about its business, operations, products, operational trends, orders, sales, revenues,

20   financial statements, markets and business prospects via access to internal corporate documents

21   (including the Company's operating plans, budgets and forecasts and reports of actual

22   operations compared thereto), conversations and connections with other corporate officers and

23   employees, attendance at management and/or Board of Directors meetings and committees

24   thereof and via reports and other information provided to them in connection therewith.

25       19.    It is appropriate to treat the Individual Defendants as a group for pleading

26   purposes under the federal securities laws and the *Federal Rules of Civil Procedure* and to

27   presume that the false, misleading and incomplete information conveyed in the Company's

28   public filings, press releases and other publications as alleged herein are the collective actions

1  of the narrowly defined group of defendants identified above.  Each of the above officers or

2  directors of Loudcloud, by virtue of his high-level position with the Company, directly

3  participated in the management of the Company, was directly involved and/or privy to the day-

4  to-day operations of the Company at the highest levels and had access to confidential

5  proprietary information concerning the Company and its business, operations, products, growth,

6  sales, revenues, earnings, financial statements, and financial condition, as alleged herein.  Said

7  defendants were involved in drafting, producing, reviewing and/or disseminating the false and

8  misleading statements and information alleged herein, were aware, or recklessly disregarded,

9  that the false and misleading statements were being issued regarding the Company, and

10  approved or ratified these statements, in violation of the federal securities laws.  Defendants'

11  false and misleading statements and omissions of fact, both on their own and in the aggregate,

12  consequently had the effect of artificially inflating the price of the securities of Loudcloud at all

13  times during the Class Period.

14        20.      As officers and controlling persons of a publicly held company whose common

15  stock was registered with the SEC pursuant to the Exchange Act, and was traded on the

16  NASDAQ and governed by the provisions of the federal securities laws, the Individual

17  Defendants each had a duty to promptly disseminate accurate and truthful information with

18  respect to the Company's orders, sales, revenues, financial condition, performance, growth,

19  operations, financial statements, business, products, markets, management, earnings and

20  business prospects, and to correct any previously issued statements that had become materially

21  misleading or untrue, so that the market price of the Company's publicly traded securities would

22  be based upon truthful and accurate information.

23        21.      The Individual Defendants, because of their positions of control and authority as

24  officers and/or directors of the Company, were able to and did control the content of the various

25  SEC filings, press releases and other public statements pertaining to the Company during the

26  Class Period.  Each of these defendants was provided with copies of the publicly disseminated

27  documents alleged herein to be misleading prior to or shortly after their issuance and/or had the

28  ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly,

each of these defendants is responsible for the accuracy of the public reports and releases

detailed herein and is therefore primarily liable for the representations contained therein.

22.     Defendants Goldman Sachs & Co. and Morgan Stanley & Co. were joint book-running managers for the Offering.  Set forth below are the "Underwriter Defendants" for the Offering and the number of shares to which each subscribed:

| Underwriters | Number of Shares |
|---|---|
| Goldman, Sachs & Co. | 9,200,000 |
| Morgan Stanley & Co. Incorporated | 9,200,000 |
| Thomas Weisel Partners LLC | 3,560,000 |
| Epoch Securities, Inc. | 1,780,000 |
| Allen & Company Incorporated | 210,000 |
| CIBC World Markets Corp. | 210,000 |
| Dain Rauscher Incorporated | 210,000 |
| Raymond James & Associates, Inc. | 210,000 |
| Robertson Stephens, Inc. | 210,000 |
| Wit SoundView Corporation | 210,000 |
| ***Total*** | ***25,000,000*** |

23.     These entities were associated with the Company and the Individual Defendants and were an integral component of the Offering.  Thus, they were privy to confidential information concerning the Company, including Loudcloud's orders, sales, revenues, financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings and true business prospects.

## **CLASS ACTION ALLEGATIONS**

24.     Plaintiffs bring this action as a class action pursuant to *Federal Rule of Civil Procedure* 23(a) and (b)(3) on behalf of a plaintiff Class, consisting of all those who purchased or otherwise acquired the securities of Loudcloud between March 8, 2001 and May 1, 2001, inclusive, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Pursuant to the Offering, 25,000,000 shares of the Company's stock were issued

and thereafter were actively traded on the NASDAQ under the ticker symbol "LDCL." While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Loudcloud or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

26.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

27.   Plaintiffs will fairly and adequately protect the interests of the members of the Class. Their counsel are competent and experienced in class and securities litigation and have been appointed by the Court as Lead Counsel in this litigation.

28.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

b.   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the true financial condition and business prospects of Loudcloud;

c.   to what extent the members of the Class have sustained damages and the proper measure of damages;

d.   whether the Registration Statement and/or the Prospectus for the Company's initial public offering was materially false and misleading; and

e.   whether the market price of Loudcloud's securities during the Class Period was artificially inflated due to the misrepresentations and/or non-disclosures complained of herein.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

30.     Loudcloud is a Delaware corporation which was formed to function as an outsourcing business, building and managing Web sites for large companies. During the year 2000, the investing community began to witness a downturn in the technology market. Thus, for new companies such as Loudcloud, it was imperative that they continue to obtain financing so that they could survive as a going concern. In furtherance of these goals, defendants constructed a scheme to take Loudcloud public through an IPO so that the Company could continue to exist. Specifically, defendants began creating a perception in the financial community that Loudcloud was a company with a bright future and that it would be in a position to grow and expand upon completion of its IPO.

31.     For example, on or about September 12, 2000, defendants issued the following press release which announced a contract with Britannica.com that stated in pertinent part:

> Loudcloud, Inc. today announced that Britannica.com, creator of leading consumer and educational Web sites, joins the list of leading companies that rely on Loudcloud's high-powered infrastructure network to automate scaling on demand and maximize performance.
>
> After witnessing the recent emergence of companies specializing in infrastructure services and web operations, Britannica.com began investigating outsourcing this function with the goal of running its business more efficiently and offering its millions of users faster and higher quality access to its Web sites. ***After a competitive review process, Britannica.com selected Loudcloud because of the depth and experience of its leadership, along with the innovation and quality of its proprietary Opsware™™ automation technology.[1]***
>
> ***"The foremost global name brands continue to entrust their confidence in***

---

[1]  Emphasis added unless otherwise indicated.

*Loudcloud as the best provider of quality services for managing their massive Internet operations," said Ben Horowitz, president and CEO of Loudcloud. "We are absolutely delighted to have forged this relationship with one of the world's most respected brands and look forward to helping Britannica.com deliver the robust customer experience that generations of users have come to depend on."*

"As Britannica.com's content and sites become increasingly sophisticated and attract more and more users, we believe Loudcloud's expertise and unique automation technology will allow us to quickly respond to our traffic growth and other customer demand issues that require instantaneous and seamless response," said Don Yannias, CEO of Britannica.com Inc. "Leveraging Loudcloud's services will enable us to focus on our core competency: presenting the Internet's best content."

Loudcloud will initially manage and host the flagship Britannica.com site; BritannicaSchool.com, the company's new educational subscription service slated to launch in mid-October; and Encyclopedia Britannica Intermediate, a proprietary product tailored to students in grades five and higher that will be offered on BritannicaSchool.com

.

32.     Shortly thereafter, on or about September 22, 2000, Loudcloud filed with the SEC a Registration Statement for 10 million shares of common stock at $10-$12 per share.

33.     On the same day, defendants issued the following release which stated:

*Loudcloud Inc. today announced the expansion of its operations into Europe with the opening of offices in London, Paris and Munich.  As a result, European companies can now take advantage of the same cutting-edge infrastructure software services and Internet operational expertise that Loudcloud has been offering in North America for nearly a year.*

When Loudcloud's presence in a United Kingdom data center opens in October, existing Loudcloud customers more easily and quickly extend their services internationally.  This helps achieve consistent levels of performance and reliability because the application can be located closer to European end-users.  Additionally, Loudcloud customers looking to enter the European marketplace will not need to find, hire and train an international operations staff to manage and monitor their deployment.

"Building a highly-skilled operations team is complex enough without trying to build several of them worldwide," said Wade Myers, Chairman and CEO of Interelate.  "Thanks to Loudcloud, our operations can scale very rapidly and still have consistently high quality around the world."

*"Our customers are eager to expand into Europe so it was imperative that Loudcloud move quickly to enhance our network of infrastructure services with international capabilities," said Ben Horowitz, CEO of Loudcloud.  "European customers can now leverage the leading edge infrastructure services that Loudcloud provides.  Likewise, business based in North America can work with Loudcloud to quickly cross the Atlantic to be closer to their European customers."*

1    Overseeing all Europe operations is Albert Benhamou, vice president of field
2    operation for Europe, Middle East and Africa.  Pascal Desaint, Dirk Hennings,
     and Danyon Lloyd will oversee operations in France and Germany respectively.

3    "European companies need the intelligent hosting technologies Loudcloud
     provides so that they can focus on their core competencies to meet customer
4    demands," said Benhamou.

5    34.    Thereafter, on or about October 3, 2000, defendants announced the appointment

6    of the following director defendants:

7    Loudcloud Inc., a provider of Internet infrastructure services, today announced
     the additions of entertainment industry executive Michael Ovitz and Intuit Inc.'s
8    chairman Bill Campbell to Loudcloud's board of directors.

9    Ovitz and Campbell join Loudcloud's current board, which includes
     Benchmark's Andy Rachleff, Loudcloud's CEO Ben Horowitz, and Loudcloud's
10   chairman Marc Andreessen.

11                                  *****

12   **"I am looking forward to helping Loudcloud address the challenges
     associated with deploying, maintaining and scaling mission-critical Internet**
13   **operations," said Ovitz.**

14                                  *****

15   **"I am very happy to join an organization which has such expertise and
     experience in operations technology, implementation, management and**
16   **scaling of Internet operations," said Campbell.**

17   "We are thrilled to have Michael and Bill join our Board," said Ben Horowitz,
     CEO of Loudcloud.  "We believe they will bring significant experience and
18   ability to their positions."

19   35.    After these announcements, defendants continued issuing press releases

20   concerning "new" contracts and business alliances.  On or about October 24, 2000, defendants

21   issued the following release which stated:

22   **Loudcloud, Inc., a software infrastructure service provider, today announced
     BlackHog, eDeploy.com, HealtheTech, MetaTV and Scudder Weisel Capital**
23   **and have joined a growing list of new customers that have selected
     Loudcloud's software infrastructure services as the foundation for deploying,**
24   **managing and maintaining scalable, secure Web sites.**

25   EDeploy.com provides a set of integrated Web-based, e-commerce modules
     designed to help worldwide organizations easily and economically manage the
26   complex process of enterprise scale IT projects. EDeploy.com has tapped
     Loudcloud to manage and maintain the underlying infrastructure software,
27   hardware and networks needed for eDeploy.com to offer its project management
     system over the Internet.

28

1
2
3

"Loudcloud's services help ensure our Web site will have 100 percent scheduled uptime and is a secure environment for our partners and customers for information sharing and project collaboration," says, Robert Gadd, Chief Technology Officer of eDeploy.com.

4
5
6

"Loudcloud gives us the time to focus on further penetrating our existing Cisco, IBM, HP, NCR and AT&T relationships, building new major channel industry partnerships and continuing to deliver a high level of customer satisfaction," adds Tom Stevenson, President and CEO of eDeploy.com, "Loudcloud's Service Level Agreement stands out in the industry and is consistent with how we take care of our customers."

7
8
9
10
11
12

Loudcloud customers -- which range from global 2000 businesses to Application Service Providers and high-growth Internet companies -- no longer need to procure, install or run the hardware and software infrastructure products that serve as the backbone of their high traffic Web sites.  Instead, through Loudcloud's Smart Cloud™™ services, a business can access the same infrastructure in the form of a 24x7 managed service.  The Smart Cloud services and a business' Web application are run on top of Loudcloud's proprietary Opsware™™ automation technology.  Opsware technology is a software platform that streamlines mission critical tasks such as provisioning, management and monitoring of a Web site.

13
14
15
16

*"In the Internet marketplace companies are under increased pressure to develop new features and meet the demand of their customers," said Loudcloud CEO Ben Horowitz.  "This is resulting in a need for them to look for outside expertise to build, manage and monitor the complex infrastructure technologies Internet businesses need to function.  Loudcloud is applying world-class software and operations experience to solve this problem in a new way and make it possible for Internet businesses to go faster, get bigger, and focus on their core businesses."*

17

36.     Similarly, on or about December 4, 2000, defendants stated in a press release:

18
19
20
21

*Art Technology Group, Inc. ("ATG") (Nasdaq: ARTG), developer of the ATG Dynamo®® e-Business Platform, and Loudcloud Inc., a leading software infrastructure service provider, today announced a new strategic alliance that will provide customers with a comprehensive software infrastructure built upon leading technologies.  ATG Dynamo, which powers hundreds of today's leading e-businesses, will be a core component of Loudcloud's Smart Cloud™™™ services.*

22
23
24
25

"Loudcloud identified ATG Dynamo as a full-featured solution that has proven performance at the enterprise-level," said Ben Horowitz, CEO and Co-founder of Loudcloud, Inc.  "By offering the ATG Dynamo technology as part of our Internet infrastructure solution, Loudcloud can now offer its customers a greater selection of e-business technologies which can be dynamically scaled for either planned growth or sudden spikes in demand."

26
27
28

By aligning with ATG, Loudcloud effectively broadens its core service offering and strengthens its commitment to providing customers with the best technology for every component of its software infrastructure services.  ATG's integrated suite of Java™™ application server-based products enables businesses to use the Internet to market, sell, and support their products and services and build their online customer relationships.  As part of the alliance, Loudcloud will

integrate ATG Dynamo into a broad software infrastructure solution including Loudcloud's Opsware™™ automation technology and will offer customers a guaranteed 100% scheduled uptime service level agreement.  The two companies will also collaborate on joint sales and marketing activities.

"Loudcloud is filling a growing market need by offering a broad suite of services and delivering reliable performance and dependable quality across the board," said Jeet Singh, CEO of ATG.  "Integrating ATG Dynamo into the Smart Cloud service offerings gives companies access to the full featured benefits of ATG Dynamo with the convenience of a pay as you go monthly service fee."

ATG powers e-business initiatives for Global 2000 enterprises and high-growth Internet businesses where even seconds of down time can be critical.  By guaranteeing 100% scheduled uptime, Loudcloud gives global companies the reliable architecture they demand in a competitive business environment.  As strategic allies, both ATG and Loudcloud will share several customer successes and will continue to work together to enable businesses to focus on core competencies while cutting the time it takes to launch on the Internet or enhance site functionality.

37.    Defendants continued with their announcements on or about December 20, 2000, at which time they announced a "strategic alliance" with Oracle Corp. as follows:

Loudcloud, a leading software infrastructure services provider, today announced a strategic alliance with Oracle Corp. (Nasdaq: ORCL) that teams Loudcloud's world-class software infrastructure operations with Oracle's enterprise consulting services.  Loudcloud will work with Oracle Consulting to offer Global 2000 companies and software companies with comprehensive services spanning e-Business strategy and planning to Internet infrastructure operations and management.

To help corporations take maximum advantage of the Internet, Loudcloud will work with Oracle to offer an integrated set of services to help businesses develop, deploy, manage and integrate a customer's Internet operations with the rest of the company's mission critical enterprise applications.  As a result, a corporation can focus internal assets to better serve its customers or pursue new business opportunities.  This alliance complements Oracle's ongoing iHost program, where software vendors are turning to both Loudcloud and Oracle for assistance moving from the offline software distribution business to the online software service model, where service providers require specialized operational services and methods best delivered by a managed service provider.

***"Loudcloud has quickly become a major player as an outsourced Internet infrastructure services provider," said Mark Salser, senior vice president at Oracle.  "Our relationship with Loudcloud will enable us to meet the needs of our shared customers and partners more effectively with a solution that addresses client needs from application development to infrastructure operations and management."***

Oracle Consulting provides customers with services ranging from e-Business strategy and applications implementation to global deployment and data and application migration.  These services can prepare customers and partners for transition to Loudcloud's infrastructure network and operational environment.  Loudcloud will offer customers with the software infrastructure required to

1   deploy, manage and monitor clients' Internet operations.  Together, Loudcloud
    and Oracle can work to build, grow, and scale customers' e-Businesses.

2

3       *"Loudcloud is focused on helping Global 2000 corporations and online
        software businesses succeed on the Internet," said Tim Howes, president of
        product operations for Loudcloud.  "One of the most important success
4       factors is the ability to fully integrate a customer's enterprise applications with
        their Internet operational environment.  We are thrilled that Loudcloud will
5       be able to offer Oracle Consulting's world-class expertise in developing and
        implementing e-business solutions that link Loudcloud's infrastructure
6       services with Oracle's industry-leading applications."*

7       38.   Defendants continued to inundate the market with similar announcements during

8   the year 2001 as well.  After all, it was becoming more important then ever to raise desperately

9   needed cash for the Company so that it could continue operating.  Since Loudcloud was going

10  through millions of dollars a month to stay afloat, if defendants were not able to consummate

11  their Offering in the near future, all would be lost.  Hence, on or about January 17, 2001,

12  defendants continued announcing agreements with new business partners such as

13  ContextMedia, Inc.:

14      Context Media, Inc. and Loudcloud, Inc., today announced a new agreement that
        will partner the power of the Context Media Interchange Platform™™™ with
15      Loudcloud's leading software infrastructure services.  Context Media's solution,
        hosted by Loudcloud, will enable content owners to realize the value locked in
16      their digital assets by empowering them to effortlessly manage and share content
        among partners across robust global IP-based network environments.

17
        Under the new agreement, Loudcloud will host Context Media's outsourced
18      content solutions, combining the strengths of the two companies' offerings to
        deliver powerful new solutions to companies seeking to leverage their digital
19      assets online.  In addition, the companies will co-market solutions, expanding
        the depth of offerings each is able to provide to their respective customer bases.
20      By pairing together solutions for Internet and content infrastructure, the two
        companies will help customers more easily share digital content and pursue new
21      revenue opportunities.

22      "In line with our strategy of partnering with best-of-breed companies," said Dan
        Harple, Context Media Chairman and CEO, "this new agreement with
23      Loudcloud will deliver the strengths of both companies' technologies and
        services to our respective customer bases.  We're looking forward to working
24      with Loudcloud on bringing companies powerful and comprehensive new
        solutions for making the most of their digital assets."
25
        *"Loudcloud's goal is to enable companies to focus on their core business
26      instead of allocating precious resources to Internet operations," said
        Loudcloud Chairman and co-founder Marc Andreessen.  "Partnering with
27      Context Media will bring additional value to customers and help make the
        Internet a precision-engineered tool for business."*
28

---

Consolidated Complaint for the Violation of
Federal Securities Laws - Case No.: C-01-20919 PVT

The Context Media Interchange Platform empowers companies to seamlessly share, license, manage and distribute their digital assets to partners and customers. It allows them to draw on the strengths of installed legacy content and asset management systems to publish and share their content across all relevant platforms, create new business models, and generate new sources of revenue from high-value content assets.

Loudcloud's Smart Cloud™™ services provide the functional components to make web sites work, from the web tier all the way down to the network. Smart Cloud services simplify rolling out new and enhanced functionality -- quickly, easily and reliably. Loudcloud's unique automation technology, Opsware™™, automates formerly manual tasks such as capacity scaling, system configuration, provisioning and versioning, and delivers new levels of scalability, availability and reliability for global Internet operations.

39. On the same day, defendants also announced a strategic alliance with Cognizant Technology Solutions:

Cognizant Technology Solutions (Nasdaq: CTSH), a leading provider of custom software development, integration and maintenance services, and Loudcloud Inc., a leading software infrastructure service provider, today announced a strategic alliance that will allow businesses to outsource the entire scope of activities needed to run the application and operations of an ebusiness.

As part of the partnership, Cognizant will manage a company's Web application, while the backend infrastructure that powers the customer's site will be managed by Loudcloud. This allows a company to focus on its core competencies, strategically leverage the Internet in new ways, grow their business and better service their customers and partners.

*"Cognizant and Loudcloud complement each other well," said Ben Horowitz, CEO and co-founder of Loudcloud. "Together we give customers a more comprehensive outsourcing solution. Loudcloud is focused on working with best of breed companies, and we are excited to be teaming with Cognizant."*

Loudcloud's infrastructure services are based upon its proprietary Opsware™™ automation technology, which automates the deployment, scalability and monitoring of large-scale Web sites backend systems. Loudcloud's Internet operations solution complements Cognizant's SEI Level 5 certified application management services. The Cognizant Application Management solution is a set of services aimed at taking over the complete responsibility for the ongoing enhancement, maintenance and support for complex Internet-based applications.

"Through this partnership we are now able to offer customers an end-to-end solution and a single point of contact," said Kumar Mahadeva, Chairman and CEO of Cognizant Technology Solutions. "We are thrilled to be partnering with Loudcloud. Now customers have experts at both ends of the Web site spectrum -- Cognizant on the front end application and Loudcloud on the backend infrastructure."

40. On or about January 23, 2001, defendants noted the addition of *six more customers* in the following release which stated:

*Loudcloud, a leading software infrastructure services provider, today announced that Aptimus, Brocade, Context Media, Crossvue (formerly ReceiptCity), Thinkchain Holdings and Xign have joined a growing list of over forty customers that have selected Loudcloud's outsourced Internet operations as the foundation for their secure Web sites.*

Loudcloud's software infrastructure services allow enterprises such as Brocade, a leading provider of storage area networking infrastructure, to more easily manage and scale their Internet operations. By leveraging Loudcloud's Internet infrastructure expertise, Brocade can focus on its core competencies as it moves to expand its Internet operations to offer enhanced communication and services for employees, partners and customers.

"Brocade selected Loudcloud to provide our web infrastructure, based on the company's operational expertise and comprehensive solutions," said Jim Cates, Chief Information Officer of Brocade. "Loudcloud's technology and services model will provide us with a scalable, reliable, and flexible solution for our web infrastructure, which is an important part of our communications with our customers and partners."

Loudcloud's customers, which range from Global 2000 businesses to Application Service Providers and high-growth Internet companies, no longer need to procure, install or run the infrastructure products that serve as the backbone of their high traffic Web sites. Instead they outsource their entire Internet operation to Loudcloud. Loudcloud's infrastructure services are based upon its proprietary Opsware™™ automation technology, which automates the deployment, scalability and monitoring of large-scale Web sites.

Opsware™™ is Loudcloud's unique automation technology that streamlines formerly manual, mission critical tasks associated with the deployment, support and growth of Internet infrastructure. This technology offers Loudcloud customers quality, scale and speed in their Internet operations, making their operations cost-effective and freeing their scarce engineering resources to work on value-creating activities.

*"Leading companies continue to select Loudcloud for high quality, cost-effective Internet operations," said Ben Horowitz, CEO of Loudcloud. "We are pleased to work with these high-caliber companies, and look forward to providing the foundation for their explosive growth."*

41.     So it seemed that Loudcloud was doing well by acquiring new customers and creating new strategic alliances which would enhance the growth of its business. Moreover, defendant Morgan Stanley, on or about February 9, 2000, purchased 66,000 units of 13% Senior Discount Notes (the "Notes") for an aggregate amount of $45.1 million. In connection with the issuance of these Notes, the Company also issued detachable warrants to Morgan Stanley to purchase an aggregate 1.2 million shares of common stock at an exercise price of $0.02 per share.

42.     Under these circumstances, on or about February 11, 2001, it was apparent that

1    the Company was not only ready, but needed, to commence its roadshow in support of an

2    upcoming IPO.  As noted in an article that was disseminated over *PR Newswire,* entitled *Media*

3    *Alert on Exclusive News Report: Loudcloud Moving Closer to IPO, Reports RedHerring.com:*

4    Loudcloud (Nasdaq: LDCL), the heavily hyped creation of Netscape founder
     Marc Andreessen, plans to begin a two-week-long road show next week with an
5    eye toward a subsequent IPO, according to two sources close to the situation.

6    "It doesn't mean the company's definitely going to IPO, but Loudcloud's
     definitely intent on testing the waters," a source told *Red Herring* Friday.  "It
7    will be a watershed event for the entire IPO market if it can go out."
     Loudcloud officials declined comment late Friday on the company's IPO plans.
8    But ever since Loudcloud filed on September 26 to go public, rumors have
     abounded about when the Internet infrastructure provider will actually make its
9    market debut.  Over the past few months, the technology IPO market has been
     virtually shut down, but there have been signs over the last two weeks that the
10   window may be opening once again.  KPMG Consulting (Nasdaq: KCIN) went
     public last Thursday; on the same day, Reuters (Nasdaq: RTRSY)'s Instinet unit
11   filed to go public.

12   **IT MIGHT NEED THE CASH**

13   Loudcloud has a few good reasons to reacquaint itself with Wall Street.
     Although its cash position stood at $143 million as of July 31, 2000, following a
14   massive $120 million round of financing in June, *Red Herring* estimates that the
     company has been burning through its reserves at a rate of $10 million a month.
15   That means its current cash position stands at around $80 million.  Of course,
     since Loudcloud hasn't filed an amendment to its S-1 since December 5, 2000,
16   these are just estimates.  Loudcloud has declined to comment on its burn rate.

17   When Loudcloud first filed for its public offering in September, it was planning
     to raise around $110 million by selling 10 million shares to the public at a price
18   of $10 to $12 a share.  The offering was for 9 percent of the total shares
     outstanding, so at this offering price, Loudcloud would be valued in excess of $1
19   billion.  But it's unclear at this time whether or not the size or range of the
     offering will be changed.
20
     Loudcloud's viability depends on recurring revenues from customers -- monthly
21   payments that range from $50,000 to $500,000.  As of October, Loudcloud had
     secured contracts that would pay the company $76 million over the course of the
22   agreement.  The company has already this year announced a deal with Brocade
     Communications (Nasdaq: BRCD).  Add to this list customers like Nike (NYSE:
23   NKE) and Fannie Mae (NYSE: FNM) -- the type of non-Internet clients able to
     pony up $500,000 per month -- and it looks like Loudcloud's plans to branch out
24   from the dot-com companies that dominated its client roster last fall are
     working.  (Names like Drspock.com, eDeploy.com, and Work.com hardly
25   inspire awe these days.)

26   Obviously, too, those new customers don't believe that Loudcloud's service is as
     expensive as the critics might have you think.  "If you project the costs out two
27   years, Loudcloud was by far the cheapest option," says Sunny McRae, a vice
     president of engineering at Xign, an electronic payment solutions provider that
28   signed a January service contract for $100,000 to $150,000 per month.

Although Loudcloud is embarking on the road show -- essentially a two-week global whirlwind of meet-and-greets where Loudcloud execs are brought before the institutional clients of lead bankers Goldman Sachs and Morgan Stanley -- that's not a guarantee that Loudcloud will actually complete its much-anticipated IPO. But the fact that Loudcloud has decided to begin the road show is a real sign that Wall Street is looking to use the company as a battering ram to force the IPO market open once again. So without further adieu, let the hype begin anew.

43.     Days later, Loudcloud filed a Form S-1/A with the SEC that increased the number of shares to be offered to 20 million and lowered the range of the stock price to $8-$10.

44.     Then, on or about February 16, 2001, an article that reiterated this information was released through *TheStreet.com* which stated:

Loudcloud said Friday that it has filed paperwork with the Securities and Exchange Commission to double the number of shares in a planned initial public offering to 20 million.

Shares will be priced from $8 to $10 each, down from $10 to $12 previously.

The company, whose co-founders include Netscape co-founder Marc Andreessen, manages Internet infrastructures for businesses.

Assuming a midpoint price of $9, Loudcloud said net proceeds would be about $165.8 million, or $190.9 million if the underwriters exercise an option to offer additional shares. Previously, Loudcloud was expecting proceeds of about $100.7 million at an assumed price of $11 a share.

The company, which changed its name from VCellar in late 1999, said after the offering there will be 67.4 million common shares outstanding, not including the underwriters' overallotment.

Morgan Stanley Dean Witter, Goldman Sachs, Thomas Weisel Partners and Epoch Partners are handling the IPO.

45.     Not long thereafter, on or about February 20, 2001, defendants noted new enhancements to its products in a press release which stated:

Loudcloud, Inc., the leading software infrastructure services provider, today announced new enhancements to its Opsware™™ automation technology, culminating in Opsware Version 2. In addition, Loudcloud is introducing new Opsware modules that help tackle some of the most complex infrastructure problems - code deployment, operational audit, and robust disaster recovery. Opsware technology is the core of Loudcloud's outsourced Internet operations solutions, and today's new enhancements are available to customers automatically as part of their ongoing Loudcloud service.

Loudcloud's unique Opsware technology captures and manages the thousands of pieces of information, decisions and processes required to deploy, manage and grow an Internet infrastructure successfully. This technology automates and

streamlines formerly manual tasks, offering Loudcloud customers the quality, scale and speed in their Internet operations not available with any other competitive solution. Data from Loudcloud's customers reveal that Opsware technology has saved its customers millions of dollars and years of engineering labor.

"Loudcloud is allowing us to more efficiently run Britannica.com, and also to help reduce the costs we will incur when we make changes designed to enhance the site, such as such as increasing capacity or adding new features," said Tony Bingham, senior vice president of technology and operations for Britannica.com Inc. "It allows us to allocate our resources and energy on what we do best - creating compelling Web sites - rather than focusing heavily on IT operations."

Loudcloud has built distinct Opsware modules - each centered on a task associated with the deployment, management or growth of Internet infrastructure. The Opsware technology foundation integrates these individual components into a single software framework, providing Loudcloud customers with the benefits of a complete automation environment coupled with a flexible technology offering. Loudcloud has enhanced Opsware technology's core functionality, and is now delivering new or enhanced modules dedicated to code deployment, operational auditing, and disaster recovery.

Opsware automation technology performs tasks with a level of precision that is consistent over time, provides infrastructure that will dynamically scale to meet the changing demands of customers, and performs functions in a fraction of the time that is required manually, freeing a customer's scarce engineering resources to work on value-creating activities.

46.   The next day, on or about February 21, 2001, the *Red Herring.com* issued the following press release entitled *Loudcloud sends smoke signals to IPO market. With the reverse two-for-one stock split, purchasers in the Loudcloud IPO will get in at prices lower than the last private round. How long can other private companies hold out?* The article stated in pertinent part:

Gone are the days when initial public offerings were one-day brand-building events that multiplied the company's market cap by 10. But now it seems the pendulum has swung so hard in the other direction that it has become untethered from its frame. IPOs, incredibly, are now *decreasing* the market capitalizations of even the brightest lights in registration.

Take Loudcloud (Nasdaq : LDCL), for example, which filed a long-awaited amendment with the Securities and Exchange Commission last week outlining management's plan to complete a $180 million offering by floating 20 million shares at $9 each. That would give Loudcloud a market cap of $607 million, which is 17 percent lower than the $728 million valuation it received way back in June in a $120 million private round. So much for IPO magic -- in its original filing from September 2000, Loudcloud sought a post-IPO market cap of $1.15 billion.

It's true that the company's 20-million-share offering doubles the number of shares Loudcloud wanted to float when it filed in September, with a price range

of $10 to $12.  But Loudcloud watchers overlooked the fact that the latest filing, dated February 16, completed a 2-for-1 reverse split of its shares.  In our opinion, this move was a clear concession to the difficult climate for floating shares in a money-losing venture -- regardless of management's pedigree.

Investors have to give credit to Loudcloud's lead bankers, Goldman Sachs and Morgan Stanley, who know better than anyone how to frame an IPO in the best light possible.  Loudcloud's filing last fall would have sold just 9.5 percent of the company's outstanding shares.  Now, public investors will hold a 29.7 percent stake in the company.

The larger-sized, $180 million offering may also highlight immediate cash needs.  Based on Loudcloud's run-rate cash burn of about $10 million per month, we would project its current cash balance at around $80 million.  As of October 31, the company reported cash reserves of $112 million, down from $142 million as of July 31.

Loudcloud's latest filing signals one thing for sure: the Internet infrastructure play is now officially on its road show, which should lead towards a March IPO -- a development *Red Herring* first reported.

47.     Then, in an attempt to give a boost to the demand for Company shares in the Offering, defendants announced an e-commerce relationship between Loudcloud and AOL through a press release which stated:

America Online Inc., the world's leading interactive services company, and Loudcloud Inc., the leading software infrastructure services provider, today announced Loudcloud's selection by AOL to be a preferred provider of AOL's e-commerce technologies.

Under the agreement between the two companies, Loudcloud will host, manage and maintain the merchant portion of AOL's QuickCheckout wallet technology and future shopping technologies as part of the suite of infrastructure software services that Loudcloud provides to its customers.  By partnering with Loudcloud, businesses can outsource all ongoing maintenance and management of their Internet site, including electronic wallet technology, to Loudcloud so they can focus on the development of their online business.

Quick Checkout allows for a more streamlined shopping process and dramatically reduces the time required to complete a transaction.  Quick Checkout enables a customer to enter routinely requested information, including up to 10 credit cards, billing information and up to 50 shipping addresses, allowing them to save time and easily complete their future online transactions.

*"Loudcloud has developed an excellent reputation for stability and scalability for e-commerce solutions and expertise in deploying and managing Internet infrastructure," said Patrick Gates, Vice President of E-Commerce at America Online."  AOL's Quick Checkout wallet technology and Loudcloud's software infrastructure services enable a business to better meet the needs of their customers."*

*"We believe that AOL's shopping technologies are among the best in the*

*business and are thrilled to be working with AOL to provide merchants with a rock solid outsourcing option for America Online's advanced e-commerce services such as QuickCheckout," said Tim Howes, president of product operations at Loudcloud.*

48.     Interestingly, the deal with AOL was finalized just days before the Offering was to be executed.  Furthermore, four of Loudcloud's founders had high ranking positions at AOL which suggests that they timed the conclusion of this deal just when the Company needed a boost of confidence from the market so that the Offering could be completed.

49.     Then, days before the beginning of the Class Period, on or about March 1, 2001, defendants announced not one, but two new contracts, in a further attempt to build on the momentum created by the AOL announcement, and the hype surrounding the Offering, and to boost confidence concerning the Company's prospects.  The first announcement concerned a contract with the UK Post Office which stated:

*Loudcloud, Inc. today announced that The UK Post Office has joined a growing list of over forty customers that have selected Loudcloud's Internet operations as the foundation for their Web sites.*

Loudcloud's software infrastructure services will allow The UK Post Office to more easily manage and scale its Internet operations.  By leveraging Loudcloud's Internet infrastructure expertise, The UK Post Office can focus on its core competencies in providing customers with even greater flexibility and reliability in offering its vast range of products and services online.  As The UK Post Office continues in its move to expand the combination of distribution services for the global businesses it serves, the Loudcloud infrastructure network provides a reliable platform to meet the evolving demands of its Internet operations.

"The UK Post Office selected Loudcloud to provide our web infrastructure, based on the company's operational expertise and comprehensive solutions," said Dick Wheelhouse, Managing Director of the e-enterprise Unit for The UK Post Office."  Loudcloud's technology and services model will provide us with a scalable, reliable, and flexible solution for our web infrastructure, which is an important part in of servicing the essential needs of our customers."

Loudcloud's customers, which range from Global 2000 businesses to Application Service Providers and high-growth Internet companies, no longer need to procure, install or run the infrastructure products that serve as the backbone of their high traffic Web sites.  Instead they work in partnership with Loudcloud to assist the ongoing successful development of these sites. Loudcloud's infrastructure services are based upon its proprietary Opsware™™ automation technology, which automates the deployment, scalability and monitoring of large-scale Web sites.

Opsware technology is Loudcloud's unique automation technology that

streamlines formerly manual, mission critical tasks associated with the deployment, support and growth of Internet infrastructure. This technology offers Loudcloud customers quality, scale and speed in their Internet operations, making their operations cost-effective and freeing their scarce engineering resources to work on value-creating activities.

*"The UK Post Office has earned the trust of the community with its long history of rock solid service," said Ben Horowitz, CEO and co-founder of Loudcloud. "That is why we are so pleased that The UK Post Office, along with many other enterprise companies, have selected Loudcloud to help them provide high quality service across the Internet."*

50.   On the same day, defendants also disseminated a news release regarding a contract with Fandango which noted:

Fandango, the Internet's premier destination for quick and easy purchasing of movie tickets on-line, today announced it has selected Loudcloud Inc., to manage, monitor and maintain its Internet site operations which is designed to allow its members to personalize their movie preferences and theater selections.

Loudcloud will provide Fandango with a high performance, high availability operational environment that delivers the ability to scale their Internet operations using Loudcloud's proprietary Opsware™™ automation technology. As part of the agreement, Loudcloud will be responsible for architecting and managing each layer of the Internet site's infrastructure including bandwidth, networking, storage, servers, and software.

"We are very happy to be working with Loudcloud," commented Art Levitt, president and CEO of Fandango. "Their knowledge of the technological aspects of e-business will allow Fandango to focus on its core mission while providing its customers with a seamless and easy experience."

Fandango is the destination-of-choice for consumers planning an evening out to the movies. Utilizing the latest technology, Fandango is the newest entrant into the world of on-line movie ticketing offering its customers show times, on-line film clips and trailers, plot synopsis, cast lists, film reviews, movie trivia, remote ticketing and tickets printed at home (in select theaters). Its partners include seven major North American theater chains: Carmike Cinemas, Century Theatres, Cinemark Theatres, Edwards Theatres, General Cinema Theatres, Loews Cineplex Entertainment, and Regal Cinemas. These seven theater companies represent over 14,000 screens.

*"Loudcloud enables e-commerce and entertainment sites like Fandango to focus on their core business, instead of allocating precious resources to Internet operations," said Ben Horowitz, CEO and co-founder of Loudcloud. "Fandango has made a name for itself by providing a high quality, interactive service and we are pleased they selected Loudcloud and our Opsware automation technology as their foundation."*

51.   Thus, while companies in the pre-IPO stage generally engage in a quiet time prior to an initial offering, defendants in this case were disseminating a flurry of announcements concerning new contracts and business for the Company. Moreover, they were

succeeding in convincing the investing community of Loudcloud's viability as an ***expanding company*** with a bright future.  In fact, Loudcloud was being touted by financial publications as a *"bright and shining IPO star"* due in great part to its *"pedigree"* which included defendant Andreessen.

52.     In fact, an article released in *The Daily Deal*, on or about March 5, 2001, proclaimed Loudcloud as the top IPO prospect for the week.  And while the article noted a certain amount of caution because of overall market conditions, the author touted the Company nevertheless:

> ***This week is more congested with secondary offerings than IPOs, but we do have a bright and shining IPO star this week, called Loudcloud, which just about everyone is already touting as the hottest IPO of 2001.***

> You can't begin to deconstruct Loudcloud without giving appropriate reverence to the company's CEO, Marc Andreessen.  Remember him? Co-founder of Netscape? Many potential investors are betting that lightning can strike twice and that Loudcloud will be as big, if not bigger, of a company and financial windfall as Netscape was.

> Loudcloud uses my new favorite terminology to describe its business: a new class.  Well, not quite (that's semantics for you).  New class, my knee-Loudcloud is an Internet infrastructure services company.  And you thought that sector was dead and buried.  It is still happening, but not with all the media fanfare.  Loudcloud's business technology services "automates formerly manual tasks associated with deployment and maintenance of Internet operations ... (and) ... provide(s) a suite of services that addresses the challenges of deploying, maintaining and growing Internet operations for critical business functions."  Basically, this is the better mousetrap.

> Get ready to take a deep breath before you look at the financials because the losses are reminiscent of the Internet IPOs of yesteryear.  ***But this is a solid investment in the Application Service Provider (ASP) market and potentially the premier name in the industry.  Partners or alliances with companies such as Accenture and Compaq, who also are buying $5 million worth of stock at a 5% discount to the IPO price, aren't too shabby.***

> The valuation of this company might appear to have only been cut by 18% from the original range of $10 to $12 per share, but there was a one-for-two reverse stock split last month, which substantially reduced the valuation of the company.  Everybody and his dog seems to have a chunk of this company in the pre-IPO phase and judging from the $123.7 million of accumulated deficit attributable to non-cash deferred stock compensation and a noncash deemed dividend on the Series C preferred stock, this is going to be an enormous payday for those insiders if the stock is anywhere near as exciting as it is being touted.

> While Loudcloud may very well be "the" stock for 2001, don't forget about its financials.  If you buy this IPO, make sure you are wired into the quarterly statements and take the time to do some homework.  If you don't understand the

financials, find someone who does.  Make sure things are progressing towards realization of their perceptions.  If this or any IPO fails to bridge that gap of confidence, the investors will be merciless with the shares.  It could be slash and burn all the way down.

53.     However, despite the positive spin created by defendants over the months concerning the Company's business and prospects, Loudcloud – a company desperate for cash – was still being met with a certain amount of difficulty in fully subscribing the Offering.  As a result, and in order to increase the appeal of the Offering, on or about March 6, 2001, Loudcloud filed another Form S-1/A with the SEC that increased the number of shares to 25 million and then lowered the price to $6 per share, at which price Loudcloud ultimately sold its shares to the public on or about March 8, 2001.  Moreover, defendant Andreessen committed to buying 500,000 shares at $6 and defendant Horowitz committed to buying 1.5 million shares.  This resulted in some after market buyers for the Company, who were desperately needed to fully subscribe the Offering.

54.     Importantly, neither the Prospectus, the Registration Statement nor any of the foregoing releases indicated that Loudcloud was on the brink of an imminent downsizing.  On the contrary, defendants repeatedly stated that the Company's viability as a going concern depended on its ability to expand.  However, despite these representations, defendants knew as early as December of 1999 that the Company would not be expanding, but rather contracting.  In fact, a former employee of the Company, who ran the central region for Loudcloud, has confirmed that he was told in December of 1999 that the Company would be undergoing a downsizing in the immediate future.  Of course, if this information had been disseminated to the investing community, the Offering would have never been completed.  Loudcloud would not have been able to raise its desperately needed cash and defendants would have been left with non-liquid shares in a company destined for failure.

55.     Nevertheless, despite the foregoing, throughout the Prospectus there are numerous references to the planned and necessary **expansion** of Loudcloud.  These statements, even in the context of "Risk Disclosures," were false and misleading because defendants were aware that the Company would be undergoing a downsizing shortly after the Offering.  In other

words, defendants' statements were false and misleading because they did not portray a

condition that "may" occur, but was **going** to occur. This made defendants' "disclosures" false

and misleading on their face. Had the investing community known that Loudcloud was going

to dramatically downsize after the Offering had been consummated, they would not have

invested in the Company since it would have been apparent that Loudcloud would not be able

to execute is plans which were wholly dependent on expanding, not contracting, as a business.

56.     Defendants made the following statements, among others, in the Prospectus and

the Registration Statement (the "Offering Papers") to the investing community which focused

on the need for the Company to grow:

> After this offering, our executive officers, directors and their affiliates will own
> approximately 46.6% of our outstanding common stock and, therefore will
> exercise significant control over all matters requiring stockholder approval. Our
> strategy is to establish Loudcloud as the leading provider of Internet
> infrastructure services. **We plan to expand the geographic scope of the
> Loudcloud Infrastructure Network and extend the capabilities of our Opsware
> technology. We also intend to continue to invest in the development and
> integration of additional services and to expand the scope of services we
> provide.** (Prospectus at 3).

> *****

> We offer business a new class of Internet infrastructure services. Using our
> Opsware technology, which automates formerly manual tasks associated with
> development and maintenance of Internet operations, we provide a suite of
> Internet operations for critical business functions. These manual tasks include
> configuring hardware with the appropriate operating system, testing the stability
> of the hardware within the overall operational environment, managing the
> performance of the hardware and software on an ongoing basis and expanding
> the capabilities of the infrastructure. Our Opsware technology allows us to
> centrally and consistently deploy and maintain our customers' Internet
> operations across multiple locations, with less manual intervention than would
> traditionally be required. **We generate revenue from the sale of our services,
> which incorporate the technology infrastructure and the deployment and
> maintenance expertise required to support and expand the scope of customer's
> Internet operations.** (Prospectus at 3).

> *****

> Some of [the risks related to our business] relate to our potential inability to:

> •     acquire and deploy a sufficient number of customers to achieve
>       profitability;

> •     successfully provide high levels of service quality to our existing
>       customers as we **expand** the scale of our business;

- •     ***develop*** new service offerings that complement our existing offerings;

- •     ***extend*** our Opsware technology to further automate and reduce the costs of many of the processes required to deploy and support our customers;

- •     ***extend*** our Opsware technology to support a wide range of hardware and software to meet the needs of a large range of customers;

- •     forecast the amount of leased third-party data center space and infrastructure that we will require in order to accommodate customer ***growth***;

- •     acquire or license third-party technologies and services that we require to deliver our services; and

- •     ***increase*** our brand awareness.  (Prospectus at 8)

*****

***Our current and future levels of operating expenses and capital expenditures are based largely on our growth plans and estimates of future revenue.***  These expenditure levels are, to a large extent, fixed in the short term.  We may not be able to adjust spending in a timely manner to compensate for any unexpected revenue shortfall, and any significant shortfall in revenue relative to planned expenditures could negatively impact our business and results of operations.  ***In addition, if our customer base expands rapidly or unpredictably, we may not be able to efficiently utilize our leased third-party data center space and infrastructure or we may not have sufficient capacity to satisfy our customers' requirements, which could harm our operating results***.  Moreover, because many of our expenses are components of our cost of revenues, our gross margins are likely to be negative for the foreseeable future.

Due to these and other factors, quarter-to-quarter comparisons of our operating results may not be meaningful.  You should not rely on our results for any one quarter as an indication of our future performance.  In future quarters, our operating results may fall below the expectations of public market analysts or investors.  If this occurs, the market price of our common stock would likely decline.

***We have grown very rapidly, and our ability to achieve profitability will suffer if we fail to manage our growth.***

***We have rapidly expanded our business since we were founded in September 1999.***  We have increased our number of employees from 71 at January 31, 2000, to 147 at April 30, 2000, and to 586 at January 31, 2001.  This growth has placed, and will continue to place, a significant strain on our employees, management systems and other resources.  ***We expect our business to continue to grow in terms of headcount, geographic scope, number of customers and number of services we offer.***  There will be additional demands on our customer service support, research and development, sales and marketing and administrative resources as we try to increase our service offerings, ***expand our geographic scope and expand our target markets.***  The strains imposed by these demands are magnified by our limited operating history.  We may not be able to successfully manage our growth.  In order to manage our growth successfully, we must:

---

Consolidated Complaint for the Violation of
Federal Securities Laws - Case No.: C-01-20919 PVT

- improve and add to our management, financial and information systems and controls and other elements of our business process infrastructure;

- maintain a high level of customer service and support; and

- *expand*, retain, train, manage and integrate our employee base effectively.

*Any failure by us to effectively manage our growth could disrupt our operations or delay execution of our business plan and consequently harm our business.*  (Prospectus at 8-9).

*****

*Our business will suffer if we are unable to hire, train and retain highly qualified employees.*

*Our future success depends on our ability to identify, hire, train, integrate and retain highly qualified technical, sales and marketing, managerial and administrative personnel.  As our customer base and revenue continue to grow, we will need to hire a significant number of qualified personnel.*  In particular, we need to hire a sufficient number of technical operations personnel in order to deploy customers on a timely basis.  Competition for qualified personnel, especially those with Internet experience, is intense, and we may not be able to attract, train, integrate or retain a sufficient number of qualified personnel in the future.  As we grow, it will become more difficult to identify qualified personnel to fill technical positions, which will cause us to rely increasingly on our internal training programs.  *Accordingly, we expect to invest heavily in our training infrastructure, and any failure to successfully expand our training infrastructure could harm our ability to compete.*  Our failure to attract, train, integrate and retain qualified personnel could seriously disrupt our operations and increase our costs by forcing us to use more expensive outside consultants and reduce the rate at which we can increase revenue.  (Prospectus at 13).

*****

*In order to grow our business and expand our geographic scope, we may require additional financing.*  We plan to finance this growth primarily with the proceeds of this offering, current and future vendor financing, equipment lease lines and bank lines of credit, as well as other debt or equity financings.  We cannot be sure that we will be able to secure additional financing on acceptable terms, or at all.  Additionally, holders of any future debt instruments or preferred stock may have rights senior to those of the holders of our common stock, and any future issuance of common stock would result in dilution of existing stockholders' equity interests.  If we are unable to obtain additional financing on acceptable terms or at all, our revenue growth may be adversely affected.

*If we do not continue to expand our direct and indirect sales organizations, we will have difficulty acquiring and retaining customers.*

Our services require a sophisticated sales effort targeted at a limited number of key people within our prospective customers' organizations.  Because the market for our services is new, many prospective customers are unfamiliar with the services we offer.  As a result, our sales effort requires highly trained sales

personnel. ***We need to continue to expand our marketing and sales organization in order to increase market awareness of our services to a greater number of organizations and, in turn, to generate increased revenue. We are in the process of developing our direct sales force, and we require additional qualified sales personnel.*** Competition for these individuals is intense, and we may not be able to hire the type and number of sales personnel we need. Moreover, even after we hire these individuals, they require extensive training in our infrastructure services. ***In addition, we must continue to develop our indirect sales and marketing channels. If we are unable to continue to expand our direct and indirect sales operations and train new sales personnel as rapidly as necessary, we may not be able to increase market awareness and sales of our services, which may prevent us from growing our revenue and achieving and maintaining profitability.*** (Prospectus at 14).

\*\*\*\*\*

We are committing significant resources to our international operations and sales and marketing activities. ***For example, we have just recently commenced operations in the United Kingdom. In addition, we plan to expand our presence more broadly in Europe and the Asia-Pacific region and may also expand into Latin America.*** (Prospectus at 17).

\*\*\*\*\*

We intend to continue to invest in research and development and new technologies to develop new services and further advance our offerings. ***In addition, an important part of our strategy is to expand our operations and employee base and build our sales, marketing, customer support, technical and operational resources.***

***We believe our success requires expanding our customer base, moving into new geographies, achieving anticipated levels of utilization of our leased third-party data center space and technology infrastructure, providing a high level of customer service and being able to scale our capabilities through automation technology.*** We expect that our operating expenses will increase as we expand our sales and marketing operations worldwide, lease additional space in third-party data centers around the world, fund greater levels of research and development and expand our related infrastructure. As a result of anticipated increases in our operating expenses, we expect to continue to incur net losses both on a quarterly and annual basis for the foreseeable future. Our operating expenses are based in part on our expectations of future revenue and are relatively fixed in the short term. As such, a delay in the recognition of revenue from one or more contracts could cause variations in our operating results from quarter to quarter and could result in greater net losses in a given quarter than expected. (Prospectus at 27).

\*\*\*\*\*

***We expect our general and administrative expenses to increase in future periods as we continue to increase headcount and add infrastructure to support our anticipated business growth and as we become subject to the increased costs associated with being a public company.*** (Prospectus at 30).

\*\*\*\*\*

We expect that our cost of revenue will increase significantly as we continue to deploy additional customers, ***increasing headcount*** and lease additional third-party data center in multiple locations.  (Prospectus at 30).

\*\*\*\*\*

Our strategy is to establish Loudcloud as the leading provider of Internet infrastructure services that enable reliable, high-quality, scalable, global and secure Internet operations.  To achieve this strategy, we intend to:

- ***Expand*** the Loudcloud Infrastructure Network;

- ***Extend*** our automation technology leadership position;

- ***Further broaden*** our service offerings;

- ***Expand*** services for our target customer segments; and

- ***Further extend*** the scope of supported technologies.  (Prospectus at 38-39).

\*\*\*\*\*

Our corporate headquarters are located in Sunnyvale, California, where we occupy approximately 195,000 square feet under leases expiring between 2002 and 2010.  In addition, we have signed one lease for additional facilities consisting of approximately 30,000 square feet in Sunnyvale, which has not yet been occupied.  This lease expires in 2005.  We have also signed a lease for a facility consisting of approximately 22,000 square feet in Virginia, which has not yet been occupied.  This lease expires in 2005.  We have numerous operating leases and licenses for third-party data center space and field sales offices.  We believe that our facilities, in conjunction with the additional space we are seeking to obtain, are adequate to meet current requirements and that additional space will be available as needed to accommodate any expansion of operations.  (Prospectus at 46).

\*\*\*\*\*

As of January 31, 2001, we had 586 full-time employees.  ***We expect to hire substantial numbers of new employees in the foreseeable future.  Our future success will depend upon our ability to attract, integrate, retain and motivate highly qualified technical and management personnel, for whom competition is intense.***  (Prospectus at 47).

57.   But despite defendants' efforts to consummate the Offering, they were having difficulty in fully subscribing the shares.  Thus, as noted above, certain defendants on or about March 8, 2001, felt compelled to purchase and did purchase 1,295,000 shares, or nearly $8 million worth of stock, as follows:

|  | Shares | Amount |
|---|---|---|
| Marc Andreessen | 500,000 | $3,000,000 |
| Michael Ovitz | 100,000 | 600,000 |
| Benchmark Capital | 695,000 | 4,170,000 |
| **Total** | **1,295,000** | **$7,770,000** |

58.     Andreessen and Benchmark had previously purchased millions of Loudcloud shares at much lower prices.  Andreessen bought at least 8 million shares at $0.33 each and Benchmark bought some 9.2 million Series B preferred shares for as little as $1.68 each.

59.     On March 9, 2001, Loudcloud began trading on the open market and was up 6.3% shortly after its debut.

60.     In the following months, defendants continued to tout the Company's prospects after the Offering was completed.  In fact, even on the day of the Offering, new contracts were reported by the Company.  For example, on or about March 9, 2001, defendants announced:

> Jamcracker Inc., a leading provider of integrated Web-based services and Loudcloud, Inc., (NASDAQ: LDCL) the leading software infrastructure services provider, today announced they have entered into a strategic agreement to jointly market and sell software services to enterprise corporations and online software service partners who are seeking a single solution for outsourcing IT application services and Internet operations.

> The alliance brings together Jamcracker's strengths in providing web-based IT services and products and Loudcloud's expertise in deploying, managing, monitoring, scaling and maintaining the infrastructure of an Internet site. Software companies who are offering their software as an online service can outsource the hosting of their Internet infrastructure to Loudcloud and gain immediate access to new sales and marketing opportunities through Jamcracker. Similarly, an enterprise corporation can now not only outsource the operations of their Internet site to Loudcloud, but also access Jamcracker's roster software services for use inside their company.

> "We believe Loudcloud's platforms for operating and managing complex Internet Infrastructures are the best in the industry and will provide an ideal solution for our clients and online software service partners who don't have the resources or experience to manage it on their own," said Todd Johnson, vice president of world-wide marketing at Jamcracker.  He added, "With managed services from Loudcloud our customers and ASP partners will have the leading service offerings for scaling their Internet infrastructure operations."

> Managing a complex infrastructure is time and resource-intensive making it difficult to rapidly add services and capacity.  Loudcloud addresses this challenge with its proprietary Opsware™™ automation technology that automates capacity management, configuration, provisioning, and versioning.

Jamcracker's customers and ASP partners can put up a hosted solution without having to worry about management, databases, operating systems, bandwidth, and connectivity.  Using Loudcloud's "pay as you go" approach, they can deploy a basic site and then add additional services as the business grows.  Since Loudcloud's infrastructure is designed for scalability, capacity can be added quickly.

*"Loudcloud provides customers with a single-point-of-contact for everything related to deploying, scaling and monitoring their Internet operations and Jamcracker brings deep expertise in web-based IT services," said Scott Dunlap, vice president of marketing at Loudcloud."  Jamcracker is a key strategic partner for us.  Together we offer customers a complete solution for outsourcing Internet and IT operations so they can stay focused on their core competencies and activities that are important to the business as a whole."*

61.    On the same day, defendants also announced an alliance with Accenture as follows:

Accenture, a leading global management and technology consultancy, and Loudcloud Inc., (NASDAQ: LDCL) the leading software infrastructure services provider, announced today that they have formed a joint marketing alliance.  The companies will work together to provide clients with services such as architecting mission critical applications, and supporting their Internet businesses 24x7x365.

Under the terms of the alliance agreement, Accenture and Loudcloud will collaborate to deliver their services to enterprise customers.  The companies have agreed to identify, pursue and refer each other to business opportunities where both their business solutions and integration services will be employed.  Clients will benefit from Accenture's expertise in designing and implementing strategic outsourcing solutions while Loudcloud provides the operational support of a client's Internet site through its Opsware™™ automation technology.  Loudcloud's Opsware™™ automation technology is designed to handle all operational aspects of Internet sites, including around-the-clock reliability, a key requirement of strategic, mission-critical applications.

"Accenture is committed to providing its clients with the best technology solutions possible," said Martin Cole, managing partner, Accenture, Solution Operations.  "We are finding that our clients are increasingly interested in implementing Internet-hosted outsourcing services.  Because Loudcloud specializes in creating and managing scaleable foundations for Internet sites, it meets the needs of such clients.  They benefit because Loudcloud's technology and Internet operations expertise complements Accenture's skills in creating, delivering, and outsourcing strategic solutions."

*"Loudcloud is focused on providing enterprise corporations with world-class Internet infrastructure services," said Ben Horowitz, CEO and co-founder Loudcloud.  "The combination of Accenture's comprehensive approach to delivering business solutions and Loudcloud's mission-critical operations technology will result in delivering a better solution to our customers."*

62.    After the Offering, *The Daily Deal* disseminated an article which summed up the

1   "expertise" of defendants in executing Loudcloud's IPO on or about March 9, 2001, and added

2   to the momentum created by defendants:

3       Never underestimate the value of a name, especially when that name is
        Goldman, Sachs & Co., Morgan Stanley Dean Witter & Co. or Marc
4       Andreessen.  Or the value of some well-timed PR.

5       Despite its lack of profits and a shortage of investor enthusiasm, the $150
        million initial public offering of Web hosting and outsourcing company
6       Loudcloud Inc. came off relatively smoothly Friday, despite a last-minute
        postponement and a price reduction Thursday that made some investors wonder
7       if the deal was in trouble.

8       The 25 million shares briefly dipped below the offering price of $6, to $5.75, but
        then drifted up as high as $6.56 before closing at $6.16.
9
        After resetting the price down from $8 to $10 last week, lead underwriters
10      Goldman Sachs and Morgan Stanley can be relieved the IPO made it to market
        at all.
11
        Confidence was in short supply in the run-up to the offering.  Since its filing in
12      October with the U.S. Securities and Exchange Commission, Loudcloud has
        adjusted the share price three times, changed the number of shares twice to put
13      nearly 29% of the company on the public markets and finally delayed the
        offering a day because of weather.  So the market was ready for a little good
14      news, and it got it Friday.

15      Shortly after trading began, the Sunnyvale, Calif. company issued a two-fer,
        saying it had roped in News Corp.'s Fox News Internet division and USA
16      Today's USAToday.com division as customers.

17      Fox and USA Today agreed to use Loudcloud's Internet outsourcing technology,
        called Opsware, a move that appeared to validate the company's business plan.
18
        ***"I would think that is certainly an affirmation of the contacts, the strategic
19      alliance potential that Netscape founder Marc Andreessen brings to the
        table," David Menlow, president of IPO Financial Network, said of the media
20      deals."  I believe it will bring additional business because people want to be
        with a winner."***
21
        The latest deals come two weeks after AOL Time Warner Inc. decided to use
22      Loudcloud for its e-commerce operations.

23      Loudcloud, founded in September 1999 by Andreessen, lost $107 million on
        revenues of a little more than $6 million in the first nine months of 2000.  It
24      burned through most of $200 million in cash last year.  The new contracts took
        the focus off those figures and the problem-plagued IPO.
25
        ***"This deal has been very carefully choreographed with time and price
26      revisions, and the underwriters put the pieces together for a deal that will
        move higher in the market," Menlow said.***
27
        ***Alex Arnold, a research analyst with Boston-based investment bank Adams
28      Harkness & Hill Inc., also is optimistic about the stock.  He expects it to do***

*better in the next six months, as the Internet infrastructure services sector draws more attention.*
*"We think this is a very important model that deserves to be funded, but it's just not what the market is looking for right now," Arnold said.  "As the company builds confidence, it should trade higher."*

*As the offer hit the market, it became clear Goldman and Morgan Stanley had gauged the market correctly, Menlow says, and the offering appears to have raised the company's profile enough to capture the attention of two big new customers.*

63.     On the same day, defendant Horowitz further touted the Offering by stating in an interview with CNBC: "Yes, well, I am extremely pleased with the offering and we are really excited to be *building* the company."  Defendant Horowitz also stated:

*Well, the great news about our numbers is that there's been a huge amount of buildup over the last five years and people are building up their Internet efforts.*  But what they are having to do now is rationalize some of the redundant expenditures, some of the -- a lot of companies have built up, you know, spending in multiple different locations for Internet efforts.  By using a service like Loudcloud, they are able to consolidate those efforts and get some really great cost savings.  *So even in a rougher economic time, the business turns out to work pretty well.*

64.     Thereafter, on or about March 19, 2001, one financial publication entitled *Weekly Corporate Growth* stated, "The fact that the company is *growing rapidly* is giving investors hope.  The firm has landed several large clients and the list is growing."

65.     Thereafter, on or about April 5, 2001, defendants announced financial results for the fiscal fourth quarter and full year of 2001.  The press release noted in pertinent part:

Loudcloud, Inc., (Nasdaq:LDCL), the leading software infrastructure service provider focused on helping Global 2000 corporations deploy, maintain and grow their Internet operations, today reported results for its fiscal fourth quarter and year ended January 31, 2001.

Financial Highlights for the Fourth Quarter:

-- Revenue increased over the previous quarter by 94% to $8.9 million from $4.6 million for the three months ended October 31, 2000.

-- Gross margin loss improved 119 percentage points, to 187% of fourth quarter revenues from 306% of third quarter revenues.

-- Significant new enterprise customers added during the fourth quarter include, among others, Blockbuster, Brocade Communications Systems and The News Corporation Limited.

-- The proportion of total fourth quarter revenues generated from enterprise customers was approximately 45%.

-- Before factoring in proceeds from its initial public offering, Loudcloud finished the year with approximately $80 million in cash and marketable securities on hand, including temporarily restricted cash. Pro forma for the initial public offering, this number increased to approximately $243 million.

Revenues for the three months ended January 31, 2001 increased over the previous quarter by 94% to $8.9 million from $4.6 million for the three months ended October 31, 2000. The pro-forma net loss for the three months ended January 31, 2001, excluding the non-cash amortization of deferred stock compensation related to employees, was $38.2 million. The net loss for the three months ended January 31, 2001, including the non-cash amortization of deferred stock compensation related to employees, was $58.8 million.

For the fiscal year ended January 31, 2001, revenue was $15.5 million, compared to $0 for the period from inception to January 31, 2000. The pro-forma net loss for the fiscal year ended January 31, 2001, excluding the non-cash amortization of deferred stock compensation related to employees and the non-cash Series C convertible preferred stock deemed dividend, was $94.7 million. The net loss for the fiscal year ended January 31, 2001, including the non-cash amortization of deferred stock compensation related to employees and the non-cash Series C convertible preferred stock deemed dividend was $234.0 million.

**"I am pleased with our accomplishments during our first public quarter and full fiscal year of business, particularly in light of the difficult economic environment," stated Ben Horowitz, Loudcloud's President and Chief Executive Officer.**

**"During the fourth quarter, we continued to increase our investment in our proprietary Opsware(TM) automation software technology. This investment allows us to continue to provide our customers with increased levels of quality, reliability and scalability for their mission critical Internet applications. In addition, our automated software solution enables us to deliver compelling cost savings to our customers, which has become increasingly important as customers look to support their Internet operations in the most cost-effective manner possible," Horowitz added.**

Subsequent to the fourth quarter end, on March 14, 2001, Loudcloud closed its initial public offering of common stock and a concurrent private placement of common stock, raising approximately $163 million in proceeds, net of underwriting discounts and commissions and offering expenses. The accompanying financial tables do not reflect the pro forma effects of the initial public offering.

66.     In light of the foregoing, all appeared well with the Company. On or about April 17, 2001, defendants continued with a round of announcements regarding the expansion of services, new contracts and alliances, stating in a press release:

Leading software infrastructure service provider Loudcloud, Inc. (NASDAQ: LDCL) and iFormation Group, a leader in the creation of new technology-enabled businesses, today announced a worldwide preferred partnership that will

make Loudcloud's Internet outsourcing service and automation technology available to iFormation Group's newly created partner companies. In addition, Loudcloud enterprise customers will have access to iFormation Group's business building capabilities.

iFormation Group, established in June 2000 by The Boston Consulting Group, General Atlantic Partners and Goldman Sachs, partners with the world's leading companies by creating, investing in, and developing new businesses that leverage their existing assets. By outsourcing their Internet operations to Loudcloud's Internet outsourcing service, which is based on the company's proprietary Opsware™™ automation technology, these businesses can focus on their core competencies and meeting customer needs.

***"By partnering with Loudcloud, businesses can outsource all ongoing maintenance and management of their Internet site, allowing them to focus on the development of their online business. By automating formerly manual functions like capacity scaling, system configuration, and versioning, Loudcloud delivers 24x7x365 reliability," said Michael Smerklo, director of business development at Loudcloud.***

"Through our alliance with Loudcloud, we can offer our business partners a high quality solution to help control costs, speed their time to market and produce better efficiency in their Internet operations as they scale," said iFormation director Sara Allan. "Loudcloud's cutting-edge technology complements iFormation's ability to act as a business-building partner for Global 200 enterprises."

67.   On the same day, defendants also announced an alliance with Sun Microsystems, Inc.:

Loudcloud Inc. (NASDAQ: LDCL), the leading software infrastructure services provider, today announced an important milestone as part of a strategic alliance with Sun Microsystems, Inc. (NASDAQ: SUNW), a leader in Internet computing. As part of the original alliance to offer Global 2000 companies comprehensive software infrastructure services built on Sun's hardware and software, Loudcloud has achieved SunTone(sm) Certification for its Outsourced Internet Operations Services offering, and is participating in Sun's Service Provider program at the highest level.

***"Loudcloud focuses on enabling Global 2000 corporations and online software businesses to succeed on the Internet," said David Posey, Loudcloud's vice president and general manager of Research and Development. "These customers want their Internet operational environment running on the best infrastructure. By aligning with one of the leaders in Internet computing and leveraging Sun's technologies, we continue to provide customers with the high level of quality and reliability they need in their Internet operations."***

Today Loudcloud also unveiled its Opsware 2i technology, which, for the first time, enables Loudcloud's Internet outsourcing service to be offered within a customer's data center. Currently in pilot stage, Opsware 2i will provide enterprise customers with the benefits of Loudcloud's expertise and its unique automation technology while leveraging customer investment in existing data

center facilities.

"Loudcloud has quickly achieved traction in the enterprise arena as an outsourced Internet infrastructure services provider," said Tim Dwyer, vice president of sales development and marketing of Sun's Network Service Provider group. "Opsware 2i technology will further enable Loudcloud to meet the needs of our shared enterprise customers. Customers can now receive the benefits of Sun's massively scalable, virtually always-on Internet computing platform combined with Loudcloud's high quality technology and services offering, in either their own or in third-party data centers."

Sun is a preferred technology provider for Loudcloud's Internet operations services offering. The Sun™™ platform includes Sun Enterprise™™ servers, running on the scalable Solaris™™ Operating Environment and iPlanet™™ Directory Server. These services are built around Loudcloud's proprietary Opsware technology, which captures and manages the numerous pieces of information, decisions and processes required to deploy, manage and grow an Internet infrastructure successfully. This technology automates and streamlines formerly manual tasks, offering Loudcloud customers quality, scale and speed in their Internet operations. As a result, corporations can focus internal assets to better serve its customers or pursue new business opportunities.

Loudcloud's participation in Sun's Service Provider program at the highest level within Sun's iForce(sm) initiative allows the two companies to develop partner and customer relationships to drive further interest in Loudcloud's Internet infrastructure services.

***SunTone Certification***

***As part of their continued commitment to deliver high quality service to its customers, Loudcloud has achieved SunTone Certification for its Outsourced Internet Operations Services through the SunTone Certification and Branding Program. SunTone certification is an indication to customers that Loudcloud will be able to deliver and support high-quality service offerings for customers to run their e-business initiatives on.***

68.     Defendants further announced, on the same day:

***Loudcloud Inc., (NASDAQ: LDCL) the leading software infrastructure services provider, today debuted its Integration Smart Cloud™™ service, allowing enterprises to extend their mission-critical computing systems to the Internet.*** The service connects Internet infrastructure that is managed, deployed and scaled by Loudcloud with the customer's back-end platforms. This seamless interaction across different architectures provides enterprises with true platform level integration.

The requirement to integrate applications, data and processes with an Internet strategy has become a new priority for many larger enterprises. Running day-to-day business with silos of data and applications that do not interact across internal divisions, partners, suppliers, and customers limits long-term growth and effectiveness. However, the integration of internal company systems with Web operations has proven difficult and costly because of the time and resources necessary.

***"For enterprise corporations to be successful using the Internet, they need***

*technology to integrate their Internet operations with the back-end operations that power the rest of the corporation," said Tim Howes, CTO and president of product operations at Loudcloud. "We are simplifying that process by turning technology integration into a service available to all Loudcloud customers. Now a company can focus on creating new applications based on this vast wealth of data, rather than being distracted by trying to manage the integration of the infrastructure itself."*

The first version of the Integration Cloud service is based on message queuing technology that enables the interchange of data between different types of computing systems asynchronously.  This service will leverage technologies from vendors such as BEA Systems Inc., TIBCO Software Inc., and webMethods Inc.  This highly reliable technology enables near real-time exchange of data.  For example, an online banking application could send a fund transfer request to the back-end banking system, which actually performs the transaction, without duplication, loss or corruption.

Loudcloud's Integration Smart Cloud service turns this critical integration technology into a subscribable service.  Furthermore, through integration with Loudcloud's proprietary Opsware™™ technology foundation, customers receive unprecedented levels of reliability and scale.  Opsware automation technology captures and manages the thousands of pieces of information, decisions and processes required to deploy, manage and grow an Internet infrastructure successfully.

Loudcloud customers -- which range from global 2000 businesses to ASPs and high-growth Internet companies -- no longer need to procure, install, configure or maintain the hardware and software infrastructure products that serve as the backbone of their high trafficked Internet site.  Instead, through Loudcloud's Smart Cloud services, a business can subscribe to the same infrastructure in the form of a 24x7 managed service.

69.     Finally, on the same day, defendants announced:

*Loudcloud Inc., (NASDAQ:LDCL) the leading software infrastructure services provider, today unveiled Opsware 2i technology, which, for the first time, enables Loudcloud's Internet outsourcing service to be offered within a customer's data center.*  Currently in pilot stage, Opsware 2i technology will provide enterprise customers with the benefits of Loudcloud's expertise and its unique automation technology while leveraging their investment in existing data center facilities.

Opsware 2i technology (the "i" stands for "inside your data center") dramatically expands the market for Loudcloud services.  Morgan Stanley Dean Witter reports that more than 80 percent of all data center space used by businesses is operated outside of a third party co-location facility.  To date, many of these businesses have been unable to consider outsourcing their Internet operations because of the costs associated with having to relocate hundreds of computers from their data centers to new co-location facilities.

Opsware 2i offers the benefits of the Loudcloud service and Opsware technology, while still allowing enterprise companies to make better use of their technical staff, leverage existing data center facilities, and utilize investments in Internet hardware and software.  Opsware 2i technology complements Loudcloud's existing Internet outsourcing service, currently available within

1   Loudcloud's data center space housed at Exodus, Equinix, and AT&T.

2   "Enterprise corporations have a dilemma: they have huge investments in
    computing facilities but are also very interested in the strategic benefits of
3   outsourcing their Internet operations," said Tim Howes, CTO and president of
    product operations at Loudcloud.  "We are providing the answer with Opsware
4   2i technology, which enables us to bring our automated approach to managing
    Internet operations to the customer.  Now a customer can focus on its business,
5   while leaving the job of keeping its site up and running to the experts at
    Loudcloud."
6
    Loudcloud customers -- which include numerous global 2000 businesses - no
7   longer need to procure, install, configure or maintain the hardware and software
    infrastructure products that serve as the backbone of their high traffic, Internet
8   site.  Instead, through Loudcloud's Smart Cloud™™ services, a business can
    subscribe to the same infrastructure in the form of a 24x7 managed service.
9   Also, these Smart Cloud services utilize Loudcloud's unique Opsware
    automation technology.  Opsware 2i technology brings the benefits of such a
10  subscription service to the customer's own data center infrastructure.

11  Opsware automation technology captures and manages via software the
    thousands of pieces of information, decisions and processes required to deploy,
12  manage and grow an Internet infrastructure.  This technology automates and
    streamlines formerly manual tasks, offering Loudcloud customers the quality,
13  scale and speed in their Internet operations not available with any other
    competitive solution.  Data from Loudcloud's customers reveal that outsourced
14  Internet operations has saved its customers millions of dollars and years of
    engineering labor.
15
    Opsware 2i technology will work through a combination of software and
16  services.  When a customer signs up for Opsware 2i technology, Loudcloud
    deploys an Opsware "core" inside the customer's data center.  This is the
17  software automation engine that Loudcloud will operate to deploy, manage,
    maintain, and scale the customer's Internet business.  Once installed, Opsware
18  technology interfaces with specific pieces of the customer's software and
    networking infrastructure.  From there, Loudcloud engineers are able to deploy,
19  manage, monitor, and dynamically scale the Internet site through the Loudcloud
    Network Operations Center.
20

21        70.      In light of the foregoing, investors believed that all was well with Loudcloud and

22  there was no reason to believe that the Company was on the brink of its demise.  On the

23  contrary, Loudcloud appeared to be strong and growing.  The Company was "expanding,"

24  which is just what defendants said Loudcloud needed to do to survive.  Thus, the investing

25  community was shocked when the defendants disclosed, without warning, that the Company

26  would be undergoing a dramatic restructuring which would result in a workforce reduction of

27  19%.  This equated to the termination of 122 Loudcloud employees.  The announcement noted

28  in pertinent part:

Loudcloud, Inc., (Nasdaq: LDCL), the leading managed services provider, today announced a series of initiatives designed to allow the company to reach cash flow breakeven with its existing cash and available financial resources. The program is the result of a review of all aspects of the company's operating and financial structure. It also reflects the benefits the company is realizing from its proprietary Opsware™™ automation software.

***Among the cost restructuring initiatives announced today are a workforce reduction of 19%, representing 122 employees and resulting in a post-restructuring workforce of 507 employees.*** The reduction is designed to facilitate continued focus on customer sales, support and satisfaction, as well as the company's core R&D efforts, while scaling back other internal support functions. In addition, Loudcloud is taking steps to maximize utilization of its existing investments in technology and data center facilities. Additional cash savings are expected through the reduction of a variety of headcount-related and discretionary expense items.

"The initiatives that we are announcing today are part of our ongoing efforts so that we prudently manage our cash expenditures," said Ben Horowitz, Loudcloud's President and Chief Executive Officer. "We are beginning to recognize the leverage in our business model, which is designed to replace human capital with technological automation. Therefore, we are confident that we can maintain our superior levels of quality and customer service with our planned staffing levels."

Rod Sherwood, Executive Vice President and Chief Financial Officer, added, "We are pleased that the initiatives we are announcing today are designed to allow us to reach cash flow breakeven with our existing financial resources, while maximizing both the quality and reliability of Loudcloud's customer service."

71.     On news of this announcement, shares of Loudcloud closed down from $6.43 on May 1, 2001, to $5.40 on May 2, 2001. Thereafter, the value of the Company's stock continued to decline, never trading again over its IPO price of $6.00 per share.

72.     The "restructuring" was aptly summed up as follows in an article in *The Industry Standard*, on or about May 4, 2001, which stated:

Let the Drumroll Begin: Loudcloud's First 60 Days – The political media has lately been obsessed with the fictional benchmark of President Bush's first 100 days in office. Perhaps a similar a yardstick for stocks will be 60 days, as in Loudcloud's first 60 days as a publicly traded company. ***But unfortunately for its employees, the Internet infrastructure services company's benchmark actually has some meaning: That's approximately the time it took for the company to slash one-fifth of its employees after staging its IPO in early March. Can a company brought public by none other than Goldman Sachs really need to cut jobs just weeks after raising $150 million? Members of the media didn't seem to believe it either.***

Not that there weren't pockets of sympathy for the company. After announcing the job cuts Tuesday, Loudcloud shrugged that it needed to conserve cash, and

1    Upside.com markets reporter Steve Ferazani said that because the company had
     been in its quiet period before the IPO, it couldn't reveal what it knew.  *But*
2    *wouldn't a company preparing to go public have the foresight to know it might*
     *have to cut costs, Yahoo FinanceVision pressed Ferazani in an interview.*
3    *Ferazani shrugged that Loudcloud's CEO had told him two weeks ago that*
     *the company had "a clear path to profitability." Other than that, he said, "they*
4    *really couldn't have told us anything."*

5    *To Christopher Byron of MSNBC, it sounded like Loudcloud simply hadn't*
     *wanted to lay off any employees before going public.  Then again, why would*
6    *anyone? That news would have to be disclosed, Byron said, and it would likely*
     *"undermine their ability to get their hands on $150 million of the public's*
7    *money."  Byron, who was apparently incensed enough by Loudcloud's actions*
     *to cover the company in an MSNBC column as well as on his daily Webcast,*
8    *added that Loudcloud's true believers were hurt.  "The people who believed*
     *against all evidence that because this thing was in the dot-com space it was*
9    *going to work."*

10   Other journos saw Loudcloud -- whose stock ended trading Friday at $4.60,
     down from a 52-week high of $7 on Tuesday -- as a metaphor in the making.
11   *ZD Interactive Investor pegged the company as one of the Net's "quickest*
     *riches-to-rags stories."*  The San Jose Mercury News wrote "Loudcloud's fate
12   has come to symbolize the dramatic downturn in fortunes for technology IPOs."
     Not bad for 60 days' work
13   .

14         73.     Later in the year, on or about September 10, 2001, Loudcloud continued to

15   reduce headcount:

16   Internet infrastructure services firm Loudcloud has announced another round of
     job cuts aimed at reducing costs and meeting other financial targets.
17
     Loudcloud [NASDAQ:LDCL] said late on Friday a reorganization would result
18   in the loss of some positions in software development.

19   The company said that a realignment of its sales force is set to create some new
     jobs, but did not reveal the number of jobs to be cut or say how many employees
20   would be hired.

21   The changes are part of Loudcloud's plan to reduce the amount of cash its
     operations swallow up as they fund their business.  Loudcloud earlier said it is
22   targeting a cash burn rate of between $18 million and $20 million by the second
     quarter of 2002.
23
     In May the company cut 19 percent of its workforce.
24
     Loudcloud was established by former Netscape and America Online technology
25   executive Marc Andreessen.

26         74.     Loudcloud's restructuring was known at least as early as December of 1999.

27   Moreover, Loudcloud's failure to raise enough money in the Offering to allow it to reach

28   cash flow break-even guaranteed that the restructuring would be a necessity.  Significantly,

1   Loudcloud suffered no adverse results between March 8 and May 1, 2001.  In fact, defendants

2   continuously announced new contracts and alliances throughout the Class Period.  Moreover,

3   on or about April 5, 2001, Loudcloud announced results for the fourth quarter revenue of $8.9

4   million and an operating loss of $37.4 million (excluding amortization of deferred stock

5   compensation), which exceeded the expectations that defendant Morgan Stanley published in

6   an analyst report dated April 4, 2001, and that defendant Thomas Weisel published in an

7   analyst report dated April 3, 2001.  Defendant Epoch Partners, in an analyst report dated April

8   6, 2001, stated Loudcloud's fourth quarter did not divert significantly from estimates.

9        75.     Today, Loudcloud no longer exists.  On or about June 17, 2002, the Company

10   announced that Electronic Data Systems Corp. ("EDS") would acquire Loudcloud's web

11   hosting business and that a licensing agreement was signed for Loudcloud's Opsware

12   Automation Software.  The purchase price for the acquired business was $63.5 million.  As part

13   of the deal, Loudcloud was to cut more than a third of its staff, and change its name to Opsware,

14   Inc.  The new company would also focus its activity around its information technology

15   software.  If the deal with EDS did not close, it is doubtful any semblance of Loudcloud would

16   have continued as a going concern.  On or about June 20, 2002, even Loudcloud's auditor,

17   Ernst & Young, raised concerns about the Company's long-term viability.

18

19                   **APPLICABILITY OF THE PRESUMPTION OF RELIANCE:**
                     **FRAUD-ON-THE-MARKET DOCTRINE**

20        76.     The market for Loudcloud's securities was open, well-developed and efficient at

21   all relevant times.  As a result of materially false and misleading statements and failures to

22   disclose discussed herein, Loudcloud's securities were purchased and/or acquired and traded at

23   artificially inflated prices during the Class Period.  The artificial inflation continued until

24   defendants disclosed the true financial condition and business prospects for the Company at the

25   end of the Class period, and this admission was communicated to, and/or digested by, the

26   securities markets.  Plaintiffs and the other members of the Class purchased or otherwise

27   acquired Loudcloud securities relying upon the integrity of the market price of Loudcloud

28   securities and market information relating to the Company, and have been damaged thereby.

---

1    77.    At all relevant times, the market for Loudcloud securities was an efficient

2    market for the following reasons, among others:

3         a. Loudcloud stock met the requirements for listing, and was listed and actively

4    traded on the NASDAQ, a highly efficient and automated market;

5         b. As a regulated issuer, Loudcloud filed periodic public reports with the SEC

6    and NASDAQ;

7         c. Loudcloud regularly communicated with public investors via established

8    market communication mechanisms, including through regular disseminations of press releases

9    on the national circuits of major newswire services and through other wide-ranging public

10    disclosures, such as communications with the financial press and other similar reporting

11    services; and

12         d. Loudcloud was followed by several securities analysts employed by major

13    brokerage firms who wrote reports which were distributed to the sales force and certain

14    customers of their respective brokerage firms.  Each of these reports was publicly available and

15    entered the public marketplace.

16    78.    As a result of the foregoing, the market for Loudcloud securities promptly

17    digested current information regarding Loudcloud from all publicly available sources and

18    reflected such information in the Company's stock price.  Under these circumstances, all

19    purchasers of Loudcloud securities during the Class Period suffered similar injury through their

20    purchase of Loudcloud securities at artificially inflated prices and a presumption of reliance

21    applies.

22    79.    During the Class Period, defendants materially misled the investing public,

23    thereby inflating the price of Loudcloud securities, by publicly issuing false and misleading

24    statements and omitting to disclose material facts necessary in order to make defendants'

25    statements, as set forth herein, not false and misleading.  Said statements and omissions were

26    materially false and misleading in that they failed to disclose material adverse information and

27    misrepresented the truth about the Company and its plans for operation and expansion.

28    80.    At all relevant times, the material misrepresentations and omissions

particularized in this Complaint were directly or proximately caused, or were a substantial contributing cause of, the damages sustained by the Lead Plaintiff and the plaintiff Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Loudcloud's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Loudcloud and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in the Lead Plaintiff and the plaintiff Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### NO SAFE HARBOR

81.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors, such as an eminent restructuring of the Company, that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Loudcloud who knew that those statements were false when made.

### COUNT I
### (Against All Defendants)
### For Violation Of §11 Of The Securities Act Of 1933

82.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

1    83.   Loudcloud is named as the issuer of the Loudcloud shares offered pursuant to

2    the Prospectus filed with the SEC and is therefore strictly liable to the Lead Plaintiff and the

3    plaintiff Class.  The Individual Defendants are named in this Count as directors of Loudcloud

4    on the date the Prospectus became effective and/or as persons who signed the Prospectus and/or

5    the Registration Statement.

6    84.   The Underwriter Defendants are named in this Count as the underwriters with

7    respect to the Offering.

8    85.   As set forth above, there were untrue statements of material fact, or omissions of

9    material fact, from the Prospectus.

10    86.   This action was brought within one year after discovery of the untrue statements

11    and omissions in and from the Prospectus should have been made through the exercise of

12    reasonable diligence, and within three years of the effective date of the Prospectus.

13    87.   By virtue of the foregoing, the Lead Plaintiff and the plaintiff Class are entitled

14    to damages under §11 as measured by the provisions of §11(e), from the defendants and each of

15    them, jointly and severally.

16                                    **COUNT II**
17    **(Against The Underwriter Defendants)**
     **For Violation Of §12(a)(2) Of The Securities Act Of 1933**

18    88.   Plaintiffs repeat and reallege the allegations set forth above as if set forth fully

19    herein, except to the extent that any such allegation may be deemed to sound in fraud.

20    89.   This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C.

21    §77l(a)(2), on behalf of the Class against the Underwriter Defendants.

22    90.   The statements referred to herein above were each made in a "prospectus" as

23    that term is defined in §12(a)(10) of the Securities Act, 15 U.S.C. §77b(a)(10), contained untrue

24    statements of material facts, omitted to state other facts necessary to make the statements made

25    not misleading, and concealed and failed to disclose material facts.  The Underwriter

26    Defendants acted to sell shares of Loudcloud in the form of common stock by way of the

27    Prospectus.  The actions included participating in the preparation of the Prospectus and other

28    materials used in the sale of Loudcloud shares.

1      91.     The Lead Plaintiff and the plaintiff Class purchased or acquired the Company's

2  common stock pursuant to the Prospectus.  Moreover, the Lead Plaintiff and the plaintiff Class

3  did not know, or in the exercise of reasonable diligence could not have known, of the untruths

4  and omissions contained in or made in connection with the Prospectus.

5      92.     By reason of the conduct alleged herein, the Underwriter Defendants violated

6  §12(a)(2) of the Securities Act.  Accordingly, purchasers who acquired the Loudcloud shares in

7  the Offering and pursuant to the Prospectus have the right to rescind and recover the

8  consideration paid for the Company's shares and may rescind and tender their shares of the

9  Company to the defendants sued herein.  Class members who have sold their Loudcloud shares

10  are entitled to recessionary damages.

11      93.     Less than three years has elapsed from the time that the securities upon which

12  this Count is brought were sold to the public to the time of the filing of this action.  Less than

13  one year has elapsed from the time when plaintiffs discovered, or reasonably could have

14  discovered, the facts upon which this Count is based to the time of the filing of this action.

**COUNT III**
**(Against The Individual Defendants)**
**For Violation Of §15 Of The Securities Act Of 1933**

17      94.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully

18  herein, except to the extent that any such allegation may be deemed to sound in fraud.

19      95.     The Individual Defendants are alleged to be control persons with respect to the

20  Offering of Loudcloud shares or through stock ownership, agency or otherwise.

21      96.     Because of their positions of control with respect to the Offering and their

22  knowledge of Loudcloud's business, they are control persons within the meaning of §15 of the

23  Securities Act.

24      97.     By virtue of the foregoing, the Lead Plaintiff and the plaintiff Class are entitled

25  to damages against the Individual Defendants, jointly and severally.

**COUNT IV**
**(Against the Loudcloud Defendants)**
**For Violations Of §10(b) Of The 1934 Act And**
**Rule 10b-5 Promulgated Thereunder**

98.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

99.     During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including the Lead Plaintiff and the plaintiff Class, as alleged herein; (ii) artificially inflate and maintain the market price of Loudcloud common stock; and (iii) cause the Lead Plaintiff and the plaintiff Class to purchase Loudcloud stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

100.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Loudcloud common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

101.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

102.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Offering of Loudcloud common shares and Loudcloud stock, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Loudcloud securities during the Class Period.

103.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.

104.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Loudcloud's common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Loudcloud's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, the Lead Plaintiff and the plaintiff Class acquired Loudcloud common stock during the Class Period at artificially inflated high prices and were damaged thereby.

105.    At the time of said misrepresentations and omissions, the Lead Plaintiff and the plaintiff Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known that the price of Loudcloud shares had been artificially inflated by the defendants' fraudulent scheme, plaintiffs would not have purchased or otherwise acquired their Loudcloud common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

106.    By virtue of the foregoing, defendants each violated §10(b) of the exchange Act and Rule 10b-5 promulgated thereunder.

1    107.   As a direct and proximate result of defendants' wrongful conduct, the Lead

2    Plaintiff and the plaintiff Class suffered damages in connection with their purchases of the

3    Company's securities during the Class Period.

4                                          **COUNT V**
                                    **(Against the Individual Defendants)**
5                              **Pursuant to §20(a) of the Exchange Act**

6    108.   Plaintiffs repeat and reallege each and every allegation contained above as

7    though fully set forth herein.

8    109.   The Individual Defendants acted as controlling persons of Loudcloud within the

9    meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

10   positions, and their ownership and contractual rights, participation in and/or awareness of the

11   Company's operations and/or intimate knowledge of the underwriting of Loudcloud's Offering,

12   the Individual Defendants had the power to influence and control and did influence and control,

13   directly or indirectly, the decision-making of Loudcloud, including the content and

14   dissemination of the various statements that plaintiffs contend are false and misleading.  The

15   Individual Defendants were provided with or had unlimited access to copies of Loudcloud's

16   reports, press releases, public filings and other statements alleged by plaintiffs to be misleading

17   prior to and/or shortly after these statements were issued and had the ability to prevent the

18   issuance of the statements or cause the statements to be corrected.

19   110.   In particular, each of these defendants had direct and supervisory involvement in

20   the day-to-day operations of Loudcloud and, therefore, is presumed to have had the power to

21   control or influence the particular transactions giving rise to the securities violations herein, and

22   exercise the same.

23   111.   As set forth above, Loudcloud and the Individual Defendants each violated

24   §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of

25   their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of

26   the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, the Lead

27   Plaintiff and the plaintiff Class suffered damages in connection with their purchases and/or

28

1   sales of Loudcloud stock during the Class Period.

2   **WHEREFORE**, the Lead Plaintiff, on behalf of himself and the plaintiff Class, prays

3   for judgment as follows:

4   A.   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the

5   *Federal Rules of Civil Procedure* and certifying plaintiff Stanley Roth, among others, as class

6   representatives for the plaintiff Class;

7   B.   Against defendants, jointly and severally for damages suffered, as a result of

8   defendants' violation of the securities laws;

9   C.   Awarding the Lead Plaintiff and the plaintiff Class, prejudgment and post-

10  judgment interest, as well as their reasonable attorneys' and experts' witness fees and other

11  costs;

12  D.   Awarding recission or recissionary damages as appropriate; and

13  E.   Awarding such other and further relief as this Court may deem just and proper.

14  <u>**JURY DEMAND**</u>

15  Plaintiffs demand a trial by jury.

16  Dated: September 26, 2002             Kevin J. Yourman
                                         Vahn Alexander
17                                       Jennifer R. Williams
                                         WEISS & YOURMAN
18
                            By:
19                                       _____
                                               Vahn Alexander
20
                                         10940 Wilshire Boulevard
21                                       24th Floor
                                         Los Angeles, CA 90024
22                                       (310) 208-2800

23                                       Joseph H. Weiss
                                         WEISS & YOURMAN
24                                       551 Fifth Ave.
                                         Suite 1600
25                                       New York, NY 10176
                                         (212) 682-3025
26
                                         *Lead Counsel for Plaintiffs*
27

28

Consolidated Complaint for the Violation of
Federal Securities Laws - Case No.: C-01-20919 PVT